OPINION
{¶ 1} Defendant-appellant, Rayshawn Easley, appeals from the judgment of the Franklin County Court of Common Pleas, whereby the trial court convicted appellant, pursuant to a jury trial, of one count of having a weapon while under disability, one count of attempted murder with a firearm specification, and two counts of felonious assault, both with firearm specifications. *Page 2 
 {¶ 2} The Franklin County Grand Jury indicted appellant on: (1) one count of attempted murder, a first-degree felony, in violation of R.C.2923.02 and 2903.02; (2) two counts of felonious assault, second-degree felonies, in violation of R.C. 2903.11; and (3) one count of having a weapon while under disability, a third-degree felony, in violation of R.C. 2923.13. The above charges concern a shooting that occurred on February 12, 2006. The attempted murder charge and one felonious assault charge involved victim Martamas Woods, and the other felonious assault charge involved victim Frank Coleman. The attempted murder charge and the felonious assault charge pertaining to Woods contained firearm specifications pursuant to R.C. 2941.145. The other felonious assault charge pertaining to Coleman contained firearm specifications pursuant to R.C. 2941.141 and 2941.145.
 {¶ 3} Appellant pled not guilty to the above charges, and a jury trial ensued. At trial, Leslita Coates testified as follows on behalf of plaintiff-appellee, the State of Ohio. On February 12, 2006, Leslita was at the home of her sister, Tierra Coates. Leslita was helping Tierra, who was recovering from surgery. While Tierra was in bed, Coleman, Woods, and appellant visited with Leslita.
 {¶ 4} During the visit, Leslita noticed a gun on the floor by Woods' feet. Appellant asked to see the gun. Leslita then testified as follows:
 [Leslita]. [Appellant] was just messing with the gun, and asking was it loaded. And they told him, be careful because it * * * had no safety. And then, then when he just got up and shot him, shot [Woods], then pointed the gun at [Coleman].
 Q. You indicated that he got up. What, had everybody been seated at that point?
 A. Yeah. *Page 3 
 Q. Okay. So who got up?
 A. [Appellant].
 * * *
 Q. And at that point, what did he do?
 A. He just shot [Woods].
(Tr. at 213-214.)
 {¶ 5} Leslita also testified that, before appellant shot Woods, he asked "is there one in the head?" (Tr. at 214.) Leslita testified that she heard the term "one in the head" before and that it denotes "the gun, when you pull the trigger, cock it back." (Tr. at 221.)
 {¶ 6} Next, Leslita testified as follows:
 Q. * * * What happened then when the shot was fired; tell us exactly how that took place?
 A. When he shot [Woods], then he pointed the gun at [Coleman]. First me, and we had our back toward him. We have both looked up and he didn't shoot. The gun wouldn't shoot.
 So that's when [Coleman] grabbed the gun. They started fighting. Then I ran out the back door; I ran to a neighbor's house.
 * * *
 Q. What did [appellant] do with the gun? Could you show us with your hand what he did with the gun?
 A. When he shot it?
 Q. Right.
 A. Just pulled the trigger. *Page 4 
 Q. Okay. Was it aimed?
 A. Yeah, he aimed it at [Woods] and shot him.
 Q. How far away was [appellant] from [Woods]?
 * * *
 A. * * * [A]rm's length.
 * * *
 Q. * * * [W]hat did [appellant] do next?
 A. [Appellant] then pointed the gun at [Coleman], and was trying to fire at [Coleman]. Then it wouldn't shoot. That's when [Coleman] grabbed his hand, and they started fighting, then * * * I ran out the back door.
 * * *
 Q. What physically was [appellant] doing at that point?
 A. Trying to pull the trigger.
 Q. And you could observe that?
 A. Yes.
 Q. And did the gun fire?
 A. No.
(Tr. at 221-225.)
 {¶ 7} Leslita testified that Exhibit G-1 "looks like" the gun that appellant fired at Woods and Coleman. (Tr. at 233.) Leslita also clarified that, before appellant shot Woods, appellant pointed the gun at Woods' face, and Leslita clarified that, when appellant pointed the gun at Coleman, appellant pulled the trigger "multiple times." (Tr. at 266.) *Page 5 
 {¶ 8} Woods testified as follows on behalf of appellee. Woods has two prior convictions for drug possession. On February 12, 2006, Woods was visiting with Leslita, Coleman, and appellant in the living room of Tierra's apartment. During the course of events, Woods fell asleep, but, eventually, Woods "just heard * * * the click back of a gun." (Tr. at 277.) Woods looked up, and appellant was standing "over top" of him with a .380 chrome gun, saying "raise up." (Tr. at 279, 277.) Woods identified Exhibit G-1 as the gun appellant was holding.
 {¶ 9} Next, according to Woods:
 I tried to get up. And I kind of turned to try to get, like, probably push off or something, defend myself. Then that's when — before I could even get all of the way up, the gun went off. But he had it pointed at me.
 Then after that, I just laid back on the couch. Then when he pointed the gun at [Coleman] and Leslita, I guess the gun jammed. And I guess that's when [Coleman] had pushed him into the wall. * * * I * * * ran out the door, and ran * * * to my daughter's home to call 911 for me.
(Tr. at 279.)
 {¶ 10} Woods then testified as follows. Woods was shot in the jaw, and the bullet lodged in his neck. When Woods was shot, it felt "like [he] got hit in the face with a sledge hammer" and he thought that he was going to die. (Tr. at 293.)
 {¶ 11} Woods was hospitalized for three days due to his gunshot wound. Woods' jaw was broken and the doctors wanted to wire his jaw shut. However, Woods refused such treatment and refused to let doctors remove the bullet because he did not want to undergo anesthesia. *Page 6 
 {¶ 12} Once while at the hospital and once after his release, police asked him to identify his shooter in a photo array. Both times, Woods identified appellant as his shooter.
 {¶ 13} Woods testified that he knew of no drugs present at Tierra's apartment before the shooting. He also testified that people were drinking beer at the apartment.
 {¶ 14} On cross-examination, Woods testified that, before the shooting, there was no gun on the floor near where he was sitting in the living room of Tierra's apartment. Woods also denied on cross-examination that appellant asked him permission to see the gun and denied that he handed the gun to appellant.
 {¶ 15} Coleman testified as follows on appellee's behalf. Coleman has prior convictions for drug possession and escape. On February 12, 2006, Coleman, Leslita, Woods, and appellant were at Tierra's apartment. Coleman was dating Leslita. People were drinking beer, but Leslita was not. Next, according to Coleman:
 * * * [Appellant] looked on the floor, and there was a gun on the floor. And he picked the gun up and said * * * what kind of gun was it?
 And then he went to cock it back. And then * * * Woods said, don't cock it back, because it don't have a safety on it-[appellant] said I just going to cock it back, just in case somebody come in the house. Then he stood up, and he pointed the gun at * * * Woods. And he said, raise up. And then he shot. Then he pointed the gun at me, and he went to shoot. But the gun was jammed.
 So, once I seen the gun was jammed, I rush him we start wrestling around the house. We broke a table by the front door. Then he asked me, he said, told me I am not going to do nothing to you. Let me go. So, he reached out and opened the front door. When he opened the front door, I shut the door and ran out the back door. *Page 7 
(Tr. at 352-353.) Coleman testified that, when he ran out the door, appellant had the gun. Coleman also clarified that he thought that appellant "pointed [the gun] towards [Woods'] head" before appellant shot Woods. (Tr. at 359.) In addition, Coleman testified that Exhibit G-1 "look[s] like it could have been the" gun that appellant used during the February 12, 2006 shooting incident. (Tr. at 360.)
 {¶ 16} Columbus Police Detective Robert Wacalec testified to the following on appellee's behalf. On February 12, 2006, after the shooting incident, Detective Wacalec and Columbus Police Officer Thomas Joyner visited Woods at the hospital and showed him a photo array containing appellant's photograph. Woods identified appellant, but was unable to speak. A few weeks later, after Woods was released from the hospital, Detective Wacalec and Officer Joyner visited Woods at his home and again showed Woods the photo array containing appellant's photograph. Woods identified appellant as the individual who shot him. On February 16, 2006, police officers arrested appellant at a home on Cherry Street, and the officers found a gun "under the mattress in the upstairs bedroom where [appellant] had been arrested." (Tr. at 98.) Detective Wacalec saw the gun and described it as a Lorcin .380 with silver and black handles. Detective Wacalec identified Exhibit G-1 as the gun recovered at the scene of appellant's arrest.
 {¶ 17} On cross-examination, Detective Wacalec testified that Lorcin .380 guns are "cheaply-made weapons" and "not as predicable or as secure as that of many weapons." (Tr. at 133-134.) On recross-examination, Detective Wacalec testified that police have not "been able to conclusively state that the firearm found at the Cherry Street address was, in fact, the firearm used" during the February 12, 2006 shooting. (Tr. at 143.) *Page 8 
 {¶ 18} Officer Joyner testified on behalf of appellee that, on February 12, 2006, after the shooting, he searched the apartment of the incident and found a shell casing with a .380 caliber in the living room. Officer Joyner testified that he retrieved the shell casing and submitted it to the property room. However, Officer Joyner testified that the shell casing was subsequently destroyed, and he did not know who ordered its destruction.
 {¶ 19} Next, Officer Joyner reiterated Detective Wacalec's testimony that Woods identified appellant in the photo arrays. Moreover, Officer Joyner testified that he was involved in arresting appellant at the Cherry Street address and that, during the arrest, police officers found a gun in the bedroom where appellant was located. Officer Joyner identified Exhibit G-1 as the gun recovered at the scene of appellant's arrest.
 {¶ 20} Officer Joyner affirmed that Exhibit G-1 is a Lorcin .380 gun, and testified that a Lorcin .380 is "a cheaply manufactured firearm" that "has had a tendency to break into pieces, and/or backfire onto the user." (Tr. at 184.) However, Officer Joyner testified that the particular weapon is not likely to fire accidentally. Officer Joyner elaborated:
 As with any weapon * * * if used in an irresponsible manner, it has potential to harm somebody. No firearm is capable of firing itself; therefore, there are no true accidental discharges. If you use it in an irresponsible manner, have your finger in the trigger guard, depress that trigger, then it's going to go boom.
(Tr. at 187.)
 {¶ 21} Columbus Police Officer Bruce Beard testified as follows on appellee's behalf. Officer Beard joined other police officers in arresting appellant. According to Officer Beard, police surrounded the apartment where appellant was staying and *Page 9 
ordered appellant to come out of the apartment. After arresting him, police searched the apartment unit. According to Officer Beard, police found a gun underneath a mattress in the room where appellant was staying. Officer Beard then testified that Exhibit G-1 appeared to be the gun that police found in the apartment after arresting appellant.
 {¶ 22} Heather McClellan of the Columbus Police Crime Laboratory testified as follows on appellee's behalf. McClellan tested Exhibit G-1 and concluded that it is an operable gun. The absence of a safety mechanism on the gun did not mean that the gun could fire on its own; the gun would still need "to have the trigger pulled." (Tr. at 464.) In particular, the gun would need six pounds of pressure applied to the trigger in order for the gun to fire. However, on recross-examination, McClellan testified that she did not test the gun to see under what circumstances the gun "could fire accidentally." (Tr. at 516.)
 {¶ 23} After appellee rested its case, appellant testified as follows on his own behalf. On February 12, 2006, appellant visited with Leslita, Coleman, and Woods at Tierra's apartment. Appellant was not carrying a gun. At the apartment, Coleman and Woods used cocaine, and appellant smoked marijuana. Appellant was "under the influence of marijuana" and Coleman and Woods were "under the influence of cocaine." (Tr. at 571.) Coleman, Woods, and appellant were also drinking alcohol.
 {¶ 24} At the apartment, Coleman was in possession of Woods' gun. The gun was a dark chrome .380 with a black hammer and black "rubber grip handle." (Tr. at 572.) Appellant then testified that Exhibit G-1 was not the above-noted gun. *Page 10 
 {¶ 25} According to appellant, Coleman gave Woods the gun, and Woods placed the gun on the floor by his feet. Appellant then asked Woods if he could have the gun. Appellant obtained the gun, and Woods indicated that the gun had no safety mechanism. Appellant asked if the gun was loaded, and Woods said "no." (Tr. at 579.)
 {¶ 26} Appellant then testified as follows:
 Q. Okay. What happened next?
 A. I was sitting there cocking the gun for him.
 Q. Why did you cock the gun?
 A. Just to make sure it was * * * safe. I thought, you know, make sure, because in case somebody come in here, be in here sleeping or something like that — looking out for him.
 * * *
 Q. Okay. You said that you cocked the gun. What do you mean by that?
 A. I pulled back the top of the top, and put one in the chamber for him.
 * * *
 A. And I was about to go outside. I didn't want to take the gun out there. So, and when I was pointing, I stood up, and I was like here. [Woods] went to try to grab the gun, kind of a little bit, not really. We weren't really in control both * * * uncock the hammer so it won't accidentally go off or something. So I had uncocked the hammer at the time the gun fired.
 * * *
 Q. * * * What do you mean when you say uncock the weapon?
 A. It's got a hammer on the gun, with like double action, like trigger move back a little bit more, make them more easy for it to go. I didn't have my finger on the trigger. What I was *Page 11 
trying to do, leave one in the head, uncock the hammer on the top of the gun for him.
 Q. Did you do that, or did you attempt to do that before you stood up or after you stood up?
 A. While I was standing up.
 Q. * * * And what happened then?
 A. Gun fired, and he was like trying to grab it, like here. Here, go outside with your gun.
 And I was standing up right here, I will be right back. That was it. And the gun went off.
 * * *
 Q. Were you aiming the gun at [Woods]? A. No, sir.
 Q. Did you ever aim that gun at anyone in that apartment? A. No, sir.
 Q. Did you ever intend to shoot anyone in that apartment? A. No, sir.
 * * *
 Q. At any point in time, did that gun jam? A. No, it wasn't.
 * * *
 Q. * * * [A]t any point in that sequence, did you point that weapon at either [Coleman] or Leslita?
 A. No, I didn't.
(Tr. at 579-584, 586, 588.) *Page 12 
 {¶ 27} Appellant testified that, after the shooting, he took the bullets out of the gun chambers. Appellant also testified that Coleman "came at" appellant and started "wrestling." (Tr. at 588.) Appellant testified that Coleman wrestled with appellant because Coleman "was angry, and he was trying to figure out what was happening. I guess that he thought that he was in danger or something." (Tr. at 589.) Appellant then testified that, when Coleman tried to grab him, he tossed Coleman to the ground. Appellant also testified that, ultimately, he gave Coleman the gun and left the apartment.
 {¶ 28} On cross-examination, appellant admitted that he had a prior conviction for felonious assault, and that, in light of his criminal record, the law precluded him from having any contact with firearms. Appellant also admitted that he gave a different version of events to individuals who previously interviewed him for a psychiatric evaluation. As an example, appellant admitted that he once told the psychiatric interviewer that he "blacked out" while visiting at Tierra's apartment and that he woke up and Coleman asked appellant why he shot Woods. (Tr. at 627.) Appellant also admitted that he alternatively stated to a psychiatric interviewer that someone else shot Woods.
 {¶ 29} After appellant testified, the trial court gave the following jury instruction:
 * * * [D]uring the course of the cross-examination of [appellant], there were questions relating to previous statements. During the course of that, in his responses, it came out that there were some evaluations conducted by psychologists and something relating to his mental capabilities and his competency.
 Now, that testimony is not to be considered by you as an indication of guilt. You can't consider that for determining whether or not he committed the offenses here. You may *Page 13 
consider it only with respect to his credibility as to whether he's being truthful or not, but certainly not to determine whether or not he committed any offense that he's charged with.
(Tr. at 671-672.)
 {¶ 30} Before the jury deliberated, appellant's counsel asked the trial court to provide jury instructions on reckless homicide, attempted reckless homicide, and attempted negligent homicide. Appellant's counsel also sought a jury instruction on aggravated menacing in regards to the felonious assault offense pertaining to Coleman. The trial court did not provide such instructions. When the trial court instructed the jury, it provided an instruction on the defense of accident.
 {¶ 31} Thereafter, the jury found appellant guilty as charged, and the trial court sentenced appellant accordingly. Appellant appeals, raising three assignments of error:
 ASSIGNMENT OF ERROR NO. 1:
 THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION AND WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.
 ASSIGNMENT OF ERROR NO. 2:
 THE TRIAL COURT ERRED WHEN IT FAILED TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSES OF RECKLESS HOMICIDE, ATTEMPTED-RECKLESS HOMICIDE, ATTEMPTED-NEGLIGENT HOMICIDE AND AGGRAVATED MENACING.
 ASSIGNMENT OF ERROR NO. 3:
 THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT FAILED TO INSTRUCT THE JURY ON DEFENSE OF "ACCIDENT." THE DEFENDANT WAS ALSO DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL DUE TO *Page 14 
THE FAILURE TO REQUEST A JURY INSTRUCTION ON THE DEFENSE OF ACCIDENT.
 {¶ 32} In his first assignment of error, appellant contends that his convictions are based on insufficient evidence. We disagree.
 {¶ 33} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict. State v. Thompkins, 78 Ohio St.3d 380, 386,1997-Ohio-52, superceded by constitutional amendment on other grounds as stated in State v. Smith, 80 Ohio St.3d 89, 1997-Ohio-355. We examine the evidence in the light most favorable to the state and conclude whether any rational trier of fact could have found that the state proved beyond a reasonable doubt the essential elements of the crime.State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, superseded by state constitutional amendment on other grounds inSmith, and following Jackson v. Virginia (1979), 443 U.S. 307; State v.Yarbrough, 95 Ohio St.3d 227, 2002-Ohio-2126, at ¶ 78. We will not disturb the verdict unless we determine that reasonable minds could not arrive at the conclusion reached by the trier of fact. Jenks at 273. In determining whether a conviction is based on sufficient evidence, we do not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. See Jenks, paragraph two of the syllabus; Yarbrough at ¶ 79 (noting that courts do not evaluate witness credibility when reviewing a sufficiency of the evidence claim); State v. Lockhart (Aug. 7, 2001), Franklin App. No. 00AP-1138.
 {¶ 34} Here, appellant was convicted of attempted murder. R.C.2903.02(A) defines "murder," the underlying offense to attempted murder, and states: *Page 15 
 No person shall purposely cause the death of another or the unlawful termination of another's pregnancy.
 {¶ 35} R.C. 2923.02(A) defines "attempt" and states:
 No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense.
 {¶ 36} As we held in State v. Johnson, Franklin App. No. 06AP-878,2007-Ohio-2792, at ¶ 33:
 A trier of fact may infer a purpose to cause death from a defendant inflicting a wound upon a person by using a deadly weapon in a manner calculated to kill. State v. Stallings (2000), 89 Ohio St.3d 280, 291; State v. Wilson, Franklin App. No. 05AP-277, 2006-Ohio-643, at ¶ 38. In making such an inference, the trier of fact may consider the places where bullets entered the victim and the resulting wounds. State v. Strodes (1976), 48 Ohio St.2d 113, 116, death penalty vacated (1978), 438 U.S. 911; Wilson at ¶ 38.
 {¶ 37} Here, appellee's witnesses established the following. On February 12, 2006, appellant retrieved a gun while visiting Coleman, Woods, and Leslita. Despite being told that there was no safety on the gun and to be careful, appellant pointed the gun at Woods' face, a part of the body with vital organs, and appellant pressed the trigger. In accordance with Johnson, such evidence was sufficient to prove that appellant, with purpose, attempted to cause Woods' death. Thus, sufficient evidence supports appellant's attempted murder conviction.
 {¶ 38} Appellant was also convicted of felonious assault in regards to the shooting incident pertaining to Woods. R.C. 2903.11(A) defines "felonious assault" and states, in pertinent part:
 No person shall knowingly do either of the following: *Page 16 
 (1) Cause serious physical harm to another * * *;
 (2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance.
 {¶ 39} R.C. 2901.01(A)(3) defines "[p]hysical harm to persons" as "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(5)(c) and (d) defines, in pertinent part, "[s]erious physical harm to persons" as "[a]ny physical harm that involves * * * some temporary, substantial incapacity" or "[a]ny physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement."
 {¶ 40} Here, considering the circumstances of the February 12, 2006 shooting, sufficient evidence supports appellant's felonious assault conviction as to the shooting of Woods, given that Woods suffered both physical harm and serious physical harm from the shooting. In particular, Woods testified that appellant shot him in the jaw and that the bullet remains in his neck. In addition, Woods spent several days in the hospital after the shooting.
 {¶ 41} Appellant was also charged with felonious assault as to Coleman. Coleman, Woods, and Leslita testified that, after shooting Woods, appellant pointed the gun at Coleman and pressed the trigger several times, only to be foiled when the gun jammed. Such conduct supports a finding that appellant attempted to cause physical harm to Coleman with a firearm, a deadly weapon under R.C. 2923.11, and that, therefore, pursuant to R.C. 2903.11(A)(2), appellant committed felonious assault as to Coleman. Thus, sufficient evidence supports appellant's conviction for felonious assault as to Coleman. *Page 17 
 {¶ 42} Each of the above offenses contained a firearm specification pursuant to R.C. 2941.145, which applies when an offender had a "firearm on or about the offender's person or under the offender's control while committing the offense" and the offender "displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." Under R.C.2923.11(B)(1):
 "Firearm" means any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. "Firearm" includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable.
 {¶ 43} Here, Coleman, Woods, and Leslita testified that appellant used a gun to facilitate the above-noted offenses. When prosecuting a firearm specification, the prosecution must prove that the firearm was operable at the time of the offense. See State v. Gaines (1989),46 Ohio St.3d 65, syllabus; State v. Murphy (1990), 49 Ohio St.3d 206, syllabus;Thompkins at 384-385. As noted above, Coleman, Woods, and Leslita testified that the gun jammed when appellant pointed the gun at Coleman. However, that the gun jammed does not preclude a jury from ultimately concluding that the gun was nonetheless operable or "readily * * * rendered operable" during the offense against Coleman. See State v.Fluellen (1993), 88 Ohio App.3d 18, 24-25. Rather, we find it significant that the gun did fire when appellant aimed it at Woods. McClellan testified that she tested a gun linked by testimony to the gun used during the February 2006 incident. She concluded that the gun was indeed operable. Through such testimony, the jury was able to conclude that, although the gun jammed when appellant pointed it toward Coleman, the gun nonetheless could "readily be rendered *Page 18 
operable" and would have eventually fired had appellant continued his attempts to shoot Coleman.
 {¶ 44} Appellant was also convicted of having a weapon while under disability. R.C. 2923.13 defines "having weapons while under disability," and states:
 (A) Unless relieved from disability as provided in section 2923.14 of the Revised Code, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:
 * * *
 (2) The person is under indictment for or has been convicted of any felony offense of violence * * *
 {¶ 45} Here, the evidence established that appellant had a prior conviction for felonious assault, an offense of violence pursuant to R.C. 2901.01(A)(9)(a). Thus, appellant was prohibited from possessing the gun that he used to commit the above-noted offenses. As such, sufficient evidence supports appellant's conviction for having a weapon while under disability.
 {¶ 46} Accordingly, based on the above, we conclude that appellant's convictions are based on sufficient evidence. Next, appellant argues that his convictions are against the manifest weight of the evidence. Again, we disagree.
 {¶ 47} In determining whether a verdict is against the manifest of the evidence, we sit as a "`thirteenth juror.'" Thompkins at 387. Thus, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id. Additionally, we determine "whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id., quoting *Page 19 State v. Martin (1983), 20 Ohio App.3d 172, 175. We reverse a conviction on manifest weight grounds for only the most" `exceptional case in which the evidence weighs heavily against the conviction.'"Thompkins at 387, quoting Martin at 175. Moreover, "`it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.'" State v.Brown, Franklin App. No. 02AP-11, 2002-Ohio-5345, at ¶ 10, quotingState v. Long (Feb. 6, 1997), Franklin App. No. 96APA04-511.
 {¶ 48} Appellant contends that his convictions are against the manifest weight of the evidence because his testimony about the February 12, 2006 shooting being accidental is more credible than the testimony of Coleman, Woods, and Leslita. However, it was within the province of the jury to believe the testimony of Coleman, Woods, and Leslita over appellant. As an example, although Coleman, Woods, and Leslita have some differences in their testimonies, these witnesses unequivocally testified not that the shooting was accidental, but that appellant both: (1) pointed the gun at Woods and shot him; and (2) pointed the gun at Coleman and tried to fire the gun. McClellan's testimony further refutes appellant's claim that the shooting was accidental. McClellan tested the gun linked by testimony as the one used during the February 2006 shooting, and McClellan testified that the gun needed six pounds of pressure on the trigger to fire.
 {¶ 49} In addition, the jury could have reasonably questioned appellant's credibility and discounted his testimony, given that he admitted to telling different versions of the shooting. The jury also could have reasonably questioned appellant's *Page 20 
ability to retain events surrounding the shooting, given that he admitted to being under the influence of marijuana during the incident.
 {¶ 50} For these reasons, we conclude that appellant's convictions are not against the manifest weight of the evidence. Having already concluded that appellant's convictions are based on sufficient evidence, we overrule appellant's first assignment of error.
 {¶ 51} In his second assignment of error, appellant contends that the trial court erred when it failed to instruct the jury on reckless homicide, attempted reckless homicide, attempted negligent homicide, and aggravated menacing. We disagree.
 {¶ 52} Appellant contends that the instructions on the above offenses were warranted here because the offenses were lesser-included offenses of the charged crimes. As indicated above, appellant sought instructions on reckless homicide, attempted reckless homicide, and attempted negligent homicide in regards to the attempted murder and felonious assault charges pertaining to Woods, and appellant sought an instruction on aggravated menacing in regards to the felonious assault charge pertaining to Coleman. Yet, appellant has failed to adequately develop his second assignment of error on appeal. Appellant provides no case law or argument to establish whether the above offenses actually are lesser-included offenses to the charged crimes, and appellant does not examine why he would be entitled to instructions on such claimed lesser-included offenses in light of the evidence. Accordingly, under App.R. 12(A)(2), we need not address appellant's undeveloped arguments, and we could sustain appellant's second assignment of error on that basis alone. See State v. D.H., Franklin App. No. 07AP-73,2007-Ohio-5970, at ¶ 57. *Page 21 
Nevertheless, in the interest of justice, we will address appellant's second assignment of error.
 {¶ 53} We first conclude that a reckless homicide instruction was not warranted because no one died from the February 2006 shooting. See R.C.2903.041. We next address whether jury instructions were warranted on attempted reckless homicide, attempted negligent homicide, and aggravated menacing.
 {¶ 54} Under Crim.R. 31(C):
 The defendant may be found not guilty of the offense charged but guilty of an attempt to commit it if such an attempt is an offense at law. When the indictment, information, or complaint charges an offense including degrees, or if lesser offenses are included within the offense charged, the defendant may be found not guilty of the degree charged but guilty of an inferior degree thereof, or of a lesser included offense.
 {¶ 55} Thus, generally, pursuant to Crim.R. 31(C), a trier of fact may reach a verdict on lesser offenses in three situations: (1) the evidence supports a finding of an attempt to commit the crime charged, if the attempt is an offense at law; (2) the evidence supports a finding that defendant committed an offense which is one of an inferior degree; or (3) the evidence supports a finding that defendant committed an offense which is a lesser-included offense. State v. Deem (1988),40 Ohio St.3d 205, 208; State v. Hairston (1997), 121 Ohio App.3d 750, 754-755.
 {¶ 56} "An offense may be a lesser-included offense of another if (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense." (Emphasis omitted.) Deem at 209. "[A]n offense is *Page 22 
an `inferior degree' of the indicted offense where its elements are identical to or contained within the indicted offense, except for one or more additional mitigating elements which will generally be presented in the defendant's case." (Emphasis omitted.) Id. Although appellant provides no case law indicating the existence of the crime of attempted reckless homicide, both appellant and appellee maintain that attempted reckless homicide is a lesser-included offense of attempted murder.
 {¶ 57} As noted above, R.C. 2923.02(A) defines "attempt," and the Committee Comment to R.C. 2923.02 states:
 "This section is a general attempt statute which consolidates several specific attempt provisions in former law, and, with three exceptions, establishes an attempt to commit any offense as an offense in itself. The exceptions are an attempt to commit conspiracy, an attempt to commit a minor misdemeanor, and an attempt to commit any offense which in itself is defined as an attempt-in these cases, attempt is not an offense."
(Emphasis omitted.) See State v. Phillips (May 8, 1998), Lucas App. No. L-97-1217, quoting Committee Comment to R.C. 2923.02. Such language indicates that attempted reckless homicide is a crime under the dictates of R.C. 2923.02(A). See, also, Cahill, Attempt, Reckless Homicide, and the Design of Criminal Law (2007), 78 U.Colo.L.Rev. 879, 921 (concluding that attempted reckless homicide is a crime under Ohio law).
 {¶ 58} R.C. 2903.041(A) defines "reckless homicide," the underlying offense to attempted reckless homicide, and states that "[n]o person shall recklessly cause the death of another or the unlawful termination of another's pregnancy." Attempted reckless homicide is a fourth-degree felony. See R.C. 2903.041(B); 2923.02(E)(1).
 {¶ 59} Appellant and appellee presumably conclude that attempted reckless homicide is a lesser-included offense of attempted murder because reckless homicide is *Page 23 
a lesser-included offense of murder. See State v. Elwell, Lorain App. No. 06CA008923, 2007-Ohio-3122, at ¶ 39; State v. Benson, Cuyahoga App. No. 87655, 2007-Ohio-830, at ¶ 112. A court need not give an instruction simply because an offense is a lesser-included offense of the crime charged. State v. Teets, Pickaway App. No. 02CA1, 2002-Ohio-6799, at ¶ 32. Rather, a jury instruction on a lesser offense is only required when the evidence presented at trial, as examined in a light most favorable to the defendant, would reasonably support both an acquittal on the crime charged and a conviction on the lesser offense. State v.Thomas (1988), 40 Ohio St.3d 213, paragraph two of the syllabus;State v. Wilkins (1980), 64 Ohio St.2d 382, 388. In determining whether the evidence supports the lesser-included offense instruction, the persuasiveness of the evidence regarding the lesser-included offense is irrelevant. Id. at 388. The trial court is only required to give the instruction on the lesser-included offense if, under any reasonable view of the evidence, it is possible for the trier of fact to find the defendant not guilty of the greater offense and guilty of the lesser offense. Id.
 {¶ 60} Here, as noted above, appellee's witnesses established that appellant acted with purpose when he shot Woods. In this regard, appellee's witnesses demonstrated that appellant committed attempted murder against Woods. Conversely, appellant provided no evidence to demonstrate his being reckless in the shooting incident against Woods. Instead, appellant claimed that the gun discharged accidentally during a struggle. Reckless conduct goes beyond what is considered to be an accident. State v. Martin, Franklin App. No. 07AP-362, 2007-Ohio-7152, at ¶ 53. Indeed, an accident claim is inconsistent with recklessness; accident is an unintentional act that denounces a culpable mental state.State v. Fears, 86 Ohio St.3d 329, 340, *Page 24 1999-Ohio-111; State v. Barnd (1993), 85 Ohio App.3d 254, 260;State v. Skeens, Noble App. No. 286, 2001-Ohio-3476. Given that appellant claimed an accident here, and not reckless conduct, and in light of the above-noted evidence otherwise establishing appellant's purposeful conduct in shooting Woods, we do not find under any reasonable view of the evidence that the jury could have found appellant not guilty of attempted murder, but guilty of attempted reckless homicide.
 {¶ 61} We next conclude that attempted reckless homicide is not a lesser-included offense to felonious assault. The greater offense, felonious assault, can be committed without the lesser offense of attempted reckless homicide. See Deem at 209 (holding that a lesser-included offense exists, in pertinent part, when "the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed"). Such is the case because an individual can commit felonious assault without attempting to cause another's death. In addition, pursuant toDeem, we conclude that attempted reckless homicide is not an inferior offense to felonious assault because the elements of each are not identical, and attempted reckless homicide is not contained within the indicted offense of felonious assault. Accordingly, we conclude that appellant was not entitled to an instruction on attempted reckless homicide.
 {¶ 62} Next, we address appellant's claim that he was entitled to an instruction on attempted negligent homicide in regards to the attempted murder charge. Although appellant provides no case law indicating the existence of the crime of attempted negligent homicide, we note that R.C. 2923.02 and its committee comments indicate that such a crime exists. R.C. 2903.05(A) defines "negligent homicide," the underlying *Page 25 
offense to attempted negligent homicide, and states that "[n]o person shall negligently cause the death of another or the unlawful termination of another's pregnancy by means of a deadly weapon or dangerous ordnance." Attempted negligent homicide is a second-degree misdemeanor. R.C. 2903.05(B); 2923.02(E)(1).
 {¶ 63} We conclude that attempted negligent homicide is not a lesser-included offense to attempted murder, given that, in State v.Koss (1990), 49 Ohio St.3d 213, 219, the Ohio Supreme Court held that negligent homicide is not a lesser-included offense of murder. We likewise conclude that attempted negligent homicide is not an inferior offense to attempted murder, given that, in State v. Price (Sept. 25, 1990), Franklin App. No. 89AP-1120, we held that negligent homicide is not an inferior offense to murder.
 {¶ 64} We also conclude that attempted negligent homicide is not a lesser-included offense to felonious assault because the greater offense, felonious assault, can be committed without the lesser offense of attempted negligent homicide. See Deem at 209. As above, we conclude as such because an individual can commit felonious assault without attempting to cause another's death. Likewise, pursuant toDeem, we conclude that attempted negligent homicide is not an inferior offense to felonious assault because the elements of each are not identical, and attempted negligent homicide is not contained within the indicted offense of felonious assault. Accordingly, based on the above, we conclude that appellant was not entitled to a jury instruction on attempted negligent homicide. *Page 26 
 {¶ 65} Lastly, we address appellant's claim that he was entitled to an instruction on aggravated menacing as a lesser-included offense of felonious assault as pertaining to Coleman. R.C. 2903.21(A) defines "aggravated menacing" and states:
 No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family.
Generally, aggravated menacing is a first-degree misdemeanor. See R.C.2903.21(B).
 {¶ 66} Despite appellant's contentions, aggravated menacing is not a lesser-included offense of felonious assault. State v. Guddy, Cuyahoga App. No. 80390, 2002-Ohio-3102, at ¶ 11; State v. LoDico, Stark App. No. 2005CA00318, 2006-Ohio-5714, at ¶ 24. Yet, aggravated menacing is a lesser offense of felonious assault in that it is an inferior offense.Guddy at ¶ 15; LoDico at ¶ 33. Regardless, a jury instruction on the lesser offense of aggravated menacing was not required here because the evidence does not support an acquittal on the charged crime of felonious assault pertaining to Coleman in favor of a conviction for aggravated menacing. See Thomas, paragraph two of the syllabus; Wilkins at 388. In particular, as demonstrated above, appellee's witnesses established that appellant committed felonious assault as to the shooting incident against Coleman, and appellant provided no evidence to demonstrate that he instead committed aggravated menacing. Indeed, appellant testified that he did not point the gun at Coleman, thereby rendering inconsistent any instruction on aggravated menacing. Thus, we conclude that appellant was not entitled to a jury instruction on aggravated menacing.
 {¶ 67} For all of these reasons, we overrule appellant's second assignment of error. *Page 27 
 {¶ 68} In his third assignment of error, appellant asserts that the trial court committed plain error when it failed to instruct the jury on the defense of accident. Appellant also claims that his counsel rendered ineffective assistance by failing to request a jury instruction on the defense of accident. However, the trial court did provide a jury instruction on the defense of accident, and, therefore, we overrule appellant's third assignment of error.
 {¶ 69} In summary, we overrule appellant's first, second, and third assignments of error. As such, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
 McGRATH, P.J., and SADLER, J., concur. *Page 1