[Cite as *State v. Timmons*, 2014-Ohio-3520.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                            :

           Plaintiff-Appellee,                    :

v.                                                       :

Robert A. Timmons,                                       :

           Defendant-Appellant.                   :

No. 13AP-1038
(C.P.C. No. 11CR-5059)
and
No. 13AP-1039
(C.P.C. No. 11CR-5557)

(REGULAR CALENDAR)

D E C I S I O N

Rendered on August 14, 2014

*Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee.

*Thomas F. Charlesworth*, for appellant.

APPEALS from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Robert A. Timmons, appeals from two judgment entries of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of two counts of felonious assault, two counts of domestic violence, one count of attempted murder, one count of kidnapping, one count of rape, one count of tampering with evidence, one count of aggravated robbery, and one count of aggravated burglary. Because sufficient evidence and the manifest weight of the evidence support appellant's convictions and the trial court did not err in not instructing on the lesser included offense of theft, we affirm.

## I. Facts and Procedural History

{¶ 2} By indictment filed September 22, 2011, the state charged appellant with two counts of felonious assault, in violation of R.C. 2903.11, both felonies of the second degree; two counts of domestic violence, in violation of R.C. 2919.25, both felonies of the

third degree; one count of attempted murder, in violation of R.C. 2923.02 and 2903.02, a felony of the first degree; one count of kidnapping, in violation of R.C. 2905.01, a felony of the first degree; one count of rape, in violation of R.C. 2907.02, a felony of the first degree; and one count of tampering with evidence, in violation of R.C. 2921.12, a felony of the third degree. All charges related to the events of September 14, 2011 and involved the same victim, J.T. On October 24, 2011, the state filed a second indictment related to the same incident, charging appellant with one count of aggravated robbery, in violation of R.C. 2911.01, a felony of the first degree, and one count of aggravated burglary, in violation of R.C. 2911.11, a felony of the first degree. Appellant entered a plea of not guilty to all charges and the parties proceeded to a single trial for all charges in both indictments.

{¶ 3} According to the state's evidence at trial, appellant and J.T. married in 2007 and divorced shortly thereafter. During the time they were married, appellant was arrested on domestic violence charges for hitting J.T.'s son. After the divorce, J.T. obtained a civil protection order against appellant. J.T. attempted to cut off contact with appellant, would ignore his phone calls, and moved three times without telling appellant her new address in an effort to avoid him. In 2010, J.T. started receiving mail at her new apartment addressed to appellant even though she had not provided him with her new address. Although she feared appellant, J.T. eventually started accepting appellant's phone calls again because she "was afraid that the violence would escalate, because when he is ignored, he becomes violent." (Tr. Vol. II, 21.) In August 2011, J.T. saw appellant in her neighborhood, and "that's when [she] started getting afraid." (Tr. Vol. II, 24.) The next day, she inquired to see if she could move out of her apartment, but she was unable to get out of her lease. J.T. testified she did not call police after these interactions because she was afraid of appellant.

{¶ 4} On September 14, 2011, J.T. was in her apartment in the late morning or early afternoon when someone knocked on her door. Expecting it to be the maintenance man from the apartment complex, J.T. opened the door without first looking through the peep hole. When she opened the door and saw that it was appellant, J.T. attempted to shut the door but appellant pushed through the door and came inside her apartment. Appellant asked for a glass of water and, while J.T. was retrieving it for him, appellant

broke both of J.T.'s cell phones.  When she handed him the glass of water, appellant took the glass and smashed it in J.T.'s face, causing her to bleed profusely.  She testified she went into the kitchen to get a towel, but appellant came up behind her and then she blacked out.  When she came to, she was wet everywhere and realized she had defecated on herself.  The next thing she remembers is appellant pushing her and telling her to get upstairs.  Once they were upstairs, J.T. testified appellant pushed her into her bedroom, forced her to lie on the bed, and then forced his penis inside her.  J.T. testified that although his penis did not stay erect, appellant was ejaculating and told her "I'm not even hard and I'm getting off."  (Tr. Vol. II, 36.)

{¶ 5}  J.T. stated she pled with appellant to let her use the bathroom, and while she was seated on the toilet, appellant came in and stabbed her in the neck.  She did not see what he used to stab her.  Appellant then left the bathroom for a few minutes, and when he returned, he stabbed J.T. in the chin.  J.T. then fell to the floor, and she said appellant proceeded to tie her legs together.  Appellant then walked downstairs, and J.T. heard the sound of her door.  Not wanting her son to come home from school and see her in that state, J.T. attempted to use the curtains from the second-story bedroom to slide down the exterior of the house.  The last thing she remembers before she blacked out again is grabbing ahold of the curtains.  Her next memory is waking up in the hospital.

{¶ 6}  J.T.'s injuries were extensive.  She required a tracheotomy to assist her breathing, a feeding tube, and a catheter.  She was hospitalized for 30 days, part of which time she spent in a medically-induced coma.  After treating her immediate injuries, J.T. required a later surgery on her shoulder, as she could not use her left arm.  She had to relearn how to eat and swallow, and she suffered permanent damage to her voice box.  She also had an additional surgery to remedy frequent infections in her throat.  J.T. still suffers from frequent pain and headaches, and she has permanent scarring.

{¶ 7}  While J.T. was hospitalized, Nurse Hayley Baker, a sexual assault nurse examiner, performed a rape kit on J.T.  Because of the need to treat her immediate injuries, the rape kit was not performed until September 15, 2011.  J.T. told Nurse Baker she had been raped, and Nurse Baker specifically clarified that the assailant put his penis in her vagina.  Nurse Baker testified she did not observe any serious injuries to J.T.'s vaginal area but that "it's very common to have a patient that states they were sexually

assaulted and have no injury." (Tr. Vol. II, 129.) Despite not finding any serious injuries, Nurse Baker testified she did observe redness on J.T.'s cervix. Nurse Baker opined that the cleaning of J.T.'s vaginal area and insertion of the Foley catheter prior to the rape kit could have had an impact on whether swabbing performed during the rape kit would yield any bodily fluids from the attacker. There was no semen found on or inside J.T.'s body.

{¶ 8} When J.T. eventually returned home from her hospital stay, she noticed her camera, her GPS device, and some money were missing. She also noticed that the suit that appellant wore at their wedding, which J.T. had paid for, was missing.

{¶ 9} The state also presented the testimony of Elijah Lykins, who testified he knew appellant because they were both living in the Hilltop area. In September 2011, both appellant and Lykins were staying at the same homeless shelter. Lykins testified that on September 14, 2011, he was driving around with appellant when appellant asked him if he wanted to accompany him to run some errands. Appellant drove to J.T.'s house and told Lykins he had to go to her house to give her money for her electric bill. Lykins waited in the car for between 45 minutes to one hour for appellant to return. When appellant emerged from J.T.'s apartment, Lykins stated he was running, "there was blood on his shoes, socks, shorts," and he "was holding a knife" and a bag. (Tr. Vol. III, 141.) When appellant got back in the car, he told Lykins he "just killed his ex-wife." (Tr. Vol. III, 143.) Appellant then drove to a hotel room where he washed off the blood. Lykins testified he stayed with appellant because appellant threatened to kill him.

{¶ 10} Lykins further testified that after appellant showered, the two men went to two different stores to buy new clothes and new shoes for appellant. After changing his clothes, appellant instructed Lykins that they needed to dispose of his bloody clothing and the items he had carried out of J.T.'s home. Appellant drove around to various locations and disposed of the bloody garments, the knife, the camera, and the suit. Lykins testified that while the two men were driving, appellant told him he hit his ex-wife with a glass, slit her neck, stabbed her a couple of times, dragged her up the stairs, put her on the toilet and left. Once appellant and Lykins returned to the homeless shelter, Lykins testified he waited for appellant to fall asleep and then he ran to police headquarters to tell them what had just transpired. Lykins then went with police to show them the hotel room where appellant had cleaned up and tried to help police recover the various items around town,

though the only location he could remember for sure was the dumpster where appellant disposed of the suit. By the time Lykins returned to the shelter, the police were already there arresting appellant.

{¶ 11} Appellant testified in his own defense. Though he did not deny going to J.T.'s apartment on September 14, 2011, he told a different version of the events that transpired once he knocked on her door. On direct examination, appellant testified he had remained in constant contact with his ex-wife since their divorce and that he went to J.T.'s on September 14, 2011 to drop off $150 for payment of an electrical bill. Once he was inside her apartment, appellant testified he did not try to have sex with J.T. but that J.T. tried to have sex with him. Appellant said he told J.T. he had to use the bathroom and she went upstairs so he followed. When he finished, he stated they both went back downstairs and sat on the sofa together, and that he stayed at her apartment for 40 or 45 minutes.

{¶ 12} Appellant admitted to seeing J.T.'s injuries but testified he did not call for help because J.T. told him not to due to his history of domestic violence convictions. Appellant stated it was J.T., not himself, that broke both of J.T.'s cell phones. Appellant testified he could not call for help from his cell phone because he had left it charging in his car with Lykins.

{¶ 13} Although appellant admitted to taking the suit, he testified the suit belonged to him and was paid for with his money that he had deposited into J.T.'s bank account. He stated he needed the suit to audition for a televised singing competition in the next few days and that J.T. knew he planned to pick up the suit. Appellant also admitted to taking the camera but again stated the camera was rightfully his. Appellant denied taking the GPS device or going through J.T.'s purse.

{¶ 14} Appellant testified he never told Lykins that he killed his ex-wife; rather, he said he told Lykins that J.T. was dead because that is how she appeared when appellant left her apartment.

{¶ 15} On cross-examination, appellant admitted J.T. had obtained a protection order against him in June 2010. He said he went to J.T.'s house twice on September 14, 2011; the first time, she did not answer the door, so he left a note on her door. He said after he left, J.T. called him, so he returned. He said he never knocked on the door

because she was already there taking the note off, so she opened the door for him and he went inside.  Appellant stated they were being affectionate on the couch and that, because of his diabetes, he suffers from erectile dysfunction so they were unable to have sex.  According to appellant, he did not ejaculate.  Appellant then stated he went to the bathroom a second time, something he did not testify to on direct examination, and that when he came back downstairs the second time, he found J.T. looking through his cell phone and was angry with him after discovering text messages from other women.  When asked why he stated on direct examination that he had left his cell phone in his car, appellant answered that he had two cell phones even though he was currently living at a homeless shelter.  Appellant admitted he did not tell any of these details to detectives; instead, he told detectives that when he went to J.T.'s house the second time, the door was unlocked and he went inside and found her already injured.

{¶ 16} Appellant further stated on cross-examination that J.T. stabbed herself because she wanted to be able to collect money from the Victims of Crime fund.  He stated J.T. threw the water glass at him but he blocked it with his hand, and the glass bounced off his hand and hit J.T. in the face.  Appellant testified that J.T. used a knife appellant had previously given to her to slit her own throat more than once, and that while she was doing that, she defecated on herself, so appellant removed her pants to help her.  He said he took the knife from her hands and dropped it on the kitchen floor and that the knife was still in J.T.'s apartment when he left.  Appellant stated the only injury he caused to J.T. was a bruise he inflicted when he attempted to stop her from cutting herself.  He testified that as he was leaving J.T.'s house, she called out to him to make sure he grabbed his possessions, meaning the suit and the camera, and she said that "when she was sitting on the toilet, dying."  (Tr. Vol. III, 248-49.)

{¶ 17} Appellant stated that after all J.T.'s injuries had occurred, he attempted to call 911 from his cell phone that he had inside her apartment but that his battery died, and he did not attempt to call 911 once he went back to his car.

{¶ 18} At the close of evidence, appellant made a Crim.R. 29 motion for acquittal which the trial court overruled.  Following deliberations, the jury returned guilty verdicts as to all charges against appellant.  At a November 14, 2013 sentencing hearing, the trial court imposed a sentence of 31 years imprisonment for the September 22, 2011

indictment to run consecutive to 16 years imprisonment for the October 24, 2011 indictment, for a total sentence of 47 years in prison. The court journalized the convictions and sentences in two judgment entries, one for each indictment, dated November 20, 2013. Appellant timely appeals.

## II. Assignments of Error

{¶ 19} Appellant assigns the following two errors for our review:

> [1.] Appellant's rape and aggravated burglary convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.

> [2.] The court erred when it did not instruct the jury of the lesser included offense of theft to aggravated robbery.

## III. First Assignment of Error

{¶ 20} In his first assignment of error, appellant argues his convictions for rape and aggravated burglary were not supported by sufficient evidence and were against the manifest weight of the evidence. Appellant makes no allegations regarding sufficiency and weight of the evidence as to all other convictions.

### A. Sufficiency of the Evidence

{¶ 21} Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id.* The relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Mahone*, 10th Dist. No. 12AP-545, 2014-Ohio-1251, ¶ 38, citing *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37.

{¶ 22} To convict a defendant of rape, the state is required to prove the defendant engaged in sexual conduct with the victim, purposely compelling her to submit by force or threat of force. *State v. Henderson*, 10th Dist. No. 10AP-1029, 2011-Ohio-4761, ¶ 16, citing R.C. 2907.02(A)(2). Pursuant to R.C. 2907.01(A), sexual conduct means "vaginal intercourse between a male and female; * * * and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." Further, "[p]enetration, however slight, is

sufficient to complete vaginal or anal intercourse." R.C. 2901.01(A)(1) defines force as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing."

{¶ 23} Here, J.T. testified appellant forced her to lie on the bed and then forced his penis inside of her vagina. This testimony is sufficient evidence to support sexual conduct by vaginal intercourse. *Henderson* at ¶ 17. Although appellant argues the evidence is insufficient because there was no physical evidence to support J.T.'s testimony, such physical or forensic evidence is not required to prove the rape offense. *Id.*, citing *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, ¶ 53 (noting "[c]orroboration of victim testimony in rape cases is not required"). Additionally, the state presented sufficient evidence that appellant used force to compel J.T. to submit. J.T. testified that appellant had already smashed a glass in her face, and she further testified that appellant physically forced her upstairs and physically forced her to lie down on the bed. *See id.* at ¶ 18. Accordingly, the state presented sufficient evidence of the offense of rape.

{¶ 24} Appellant also asserts there was insufficient evidence to support his conviction of aggravated burglary. R.C. 2911.11(A)(1) defines aggravated burglary as a burglary in which the offender "inflicts, or attempts or threatens to inflict physical harm on another." In defining burglary, R.C. 2911.12(A)(1) provides that "[n]o person, by force, stealth, or deception, shall * * * [t]respass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense." A person criminally trespasses when he "knowingly enter[s] or remain[s] on the land or premises of another * * * without privilege to do so." R.C. 2911.21(A)(1). Privilege is defined as "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of * * * [a] relationship." R.C. 2901.01(A)(12).

{¶ 25} J.T. testified at length about the injuries she sustained from appellant's attack on her, from the glass smashed in her face to the various stab wounds. This is sufficient evidence to prove appellant inflicted physical harm on J.T. Additionally, J.T. testified that when she attempted to close the door on appellant, he forced the door open and entered her apartment without permission. Appellant's act of pushing the door open when J.T. attempted to close the door meets the statutory definition of force in

R.C. 2901.01(A)(1). *See, e.g., State v. Stringer*, 9th Dist. No. 04CA0032-M, 2004-Ohio-6543, ¶ 35 (finding state presented sufficient evidence of the entering by force element of aggravated burglary when it presented testimony that the defendant "put her foot in the doorway prohibiting [the victim] from closing the door"). Both appellant and J.T. testified that appellant had never been in J.T.'s apartment before September 14, 2011, and J.T. testified she went to great lengths to conceal her address from him. Thus, the state presented sufficient evidence that appellant entered and remained in J.T.'s apartment without privilege to do so. Finally, though appellant testified it was not his intent to commit any crimes when he entered J.T.'s apartment, the totality of the rest of the evidence suggests otherwise, including the couple's history of domestic violence and J.T.'s testimony as to appellant's behavior leading up to, and during, the time he entered her apartment on September 14, 2011. The jury is free to infer intent from the entire set of circumstances surrounding the commission of the offenses. *State v. Loughman*, 10th Dist. No. 10AP-636, 2011-Ohio-1893, ¶ 47, citing *State v. Grant*, 67 Ohio St.3d 465, 478 (1993), citing *Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St. 329 (1955), paragraph three of the syllabus. Accordingly, when viewing the evidence in the light most favorable to the state, we conclude the state presented sufficient evidence for appellant's aggravated burglary conviction.

{¶ 26} Because we conclude there was sufficient evidence to sustain both appellant's rape and aggravated burglary convictions, we must next determine whether those convictions are nonetheless against the manifest weight of the evidence.

### B. Manifest Weight of the Evidence

{¶ 27} When presented with a manifest weight argument, an appellate court engages in a limited weighing of the evidence to determine whether sufficient competent, credible evidence supports the jury's verdict. *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 32, citing *Thompkins* at 387. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a ' "thirteenth juror" ' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Determinations of credibility and weight of the testimony are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one

of the syllabus.  Thus, the jury may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 28} An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387.  Appellate courts should reverse a conviction as being against the manifest weight of the evidence in only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 29} Appellant restates much of his argument regarding sufficiency of the evidence for purposes of his manifest weight argument.  For the rape conviction, appellant asserts the jury clearly lost its way in concluding appellant raped J.T. because there was conflicting testimony as to whether they engaged in sexual intercourse at all, there was no physical evidence of rape, and despite the fact that J.T. testified that appellant ejaculated, there was no semen detected at the crime scene or during the rape kit examination.  For the aggravated burglary conviction, appellant asserts the jury lost its way in concluding he trespassed into J.T.'s home by force.  Again, appellant relies on the conflicting testimony of J.T. and appellant, and appellant asserts it was a manifest miscarriage of justice for the jury not to believe his testimony that J.T. invited appellant into her home.

{¶ 30} In light of the evidence discussed above, as well as the record in its entirety, we do not find the jury clearly lost its way in concluding appellant committed the offenses of rape and aggravated burglary when he forced his way into J.T.'s home, smashed a glass in her face, forced her to lie down and forcibly penetrated her vagina with his penis, then stabbed her repeatedly, robbed her, and left her there to die.  J.T. was consistent in her version of events from the time police first interviewed her until the time she testified at trial.  The only evidence to the contrary was appellant's own self-serving testimony which

was markedly different from the version of events he told police and was riddled with inconsistencies throughout, and we agree with the jury's decision to discount that testimony in favor of ample other evidence at trial.  Thus, we do not find that appellant's convictions for rape and aggravated burglary are against the manifest weight of the evidence.

{¶ 31} Having concluded that both the sufficiency and manifest weight of the evidence support appellant's convictions of rape and aggravated burglary, we overrule appellant's first assignment of error.

## IV. Second Assignment of Error

{¶ 32} In his second assignment of error, appellant argues the trial court erred when it failed to instruct the jury on the lesser included offense of theft to the aggravated robbery charge.  Because appellant did not object to the jury instructions, we review the alleged impropriety under the "plain error" standard of review.  *State v. Jackson*, 92 Ohio St.3d 436, 444 (2001), citing *State v. Underwood*, 3 Ohio St.3d 12 (1983), syllabus; Crim.R. 52(B).  An appellate court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice.  *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, ¶ 58 (10th Dist.), citing *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 139.

{¶ 33} For an error to be a "plain error" under Crim.R. 52(B), it must satisfy three prongs: (1) there must be an error, meaning a deviation from a legal rule, (2) the error must be "plain," meaning an "obvious" defect in the trial proceedings, and (3) the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial.  *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

{¶ 34} An offense is a lesser included offense of another where: (1) the lesser offense carries a lesser penalty, (2) the greater offense, as statutorily defined, cannot ever be committed without the lesser offense, as statutorily defined, being committed, and (3) some element of the greater offense is not required to prove commission of the lesser offense.  *State v. Hubbard*, 10th Dist. No. 11AP-945, 2013-Ohio-2735, ¶ 37, citing *State v. Deem*, 40 Ohio St.3d 205, 209 (1988).   Where the evidence introduced at trial would reasonably support both an acquittal on the crime charged in the indictment and a conviction upon a lesser included offense, the trial court must instruct the jury on the

lesser included offense. *Pilgrim* at ¶ 68, citing *State v. Thomas*, 40 Ohio St.3d 213 (1988), paragraph two of the syllabus.

{¶ 35} The offense of aggravated robbery provides that "[n]o person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it; [h]ave a dangerous ordnance on or about the offender's person or under the offender's control; [or] [i]nflict, or attempt to inflict, serious physical harm to another." R.C. 2911.01(A)(1)-(3).

{¶ 36} "Theft, as defined in R.C. 2913.02, is a lesser included offense of robbery, as defined in R.C. 2911.02" because it would be impossible to ever commit a robbery by theft without also committing a theft. *State v. Smith*, 117 Ohio St.3d 447, 2008-Ohio-1260, paragraph two of the syllabus. By the same logic, theft is also a lesser included offense of aggravated robbery, as defined in R.C. 2911.01.

{¶ 37} However, the mere fact that an offense is a lesser included offense of the charged offense does not mean that the trial court must instruct on both offenses. *State v. Keith*, 10th Dist. No. 08AP-28, 2008-Ohio-6122, ¶ 35, citing *State v. Wilkins*, 64 Ohio St.2d 382, 387 (1980), and *State v. Easley*, 10th Dist. No. 07AP-578, 2008-Ohio-468, ¶ 59. The trial court is required to instruct on the lesser included offense only where the evidence at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense. *Id.*, citing *State v. Robb*, 88 Ohio St.3d 59, 74 (2000), and *State v. Shane*, 63 Ohio St.3d 630, 632-33 (1992). In determining whether the lesser included offense instruction is warranted, "[t]he court must view the evidence in the light most favorable to the defendant." *State v. Campbell*, 69 Ohio St.3d 38, 47-48 (1994), citing *Wilkins* at 388.

{¶ 38} When determining whether the evidence reasonably supports the lesser included offense instruction, " '[t]he persuasiveness of the evidence regarding the lesser included offense is irrelevant.' " *Keith* at ¶ 36, quoting *Wilkins* at 388. The trial court must give the lesser included offense instruction " '[i]f under any reasonable view of the evidence it is possible for the trier of fact to find the defendant not guilty of the greater offense and guilty of the lesser offense.' " *Id.*, quoting *Wilkins* at 388. The trial court must

consider the evidence in the light most favorable to the defendant.  *Id.*, citing *Wilkins* at 388.  However, the trial court need not instruct on the lesser included offense every time "some evidence" is presented on a lesser included offense; rather, the key inquiry is whether a jury could *reasonably* reject the greater offense and find the defendant guilty of the lesser included offense.  *Id.*, citing *Shane* at 632-33 (reasoning that "[t]he jury would be unduly confused if it had to consider the option of guilty on a lesser included (or inferior-degree) offense when it could not reasonably return such a verdict").

{¶ 39} In this case, an instruction on theft should have been given only if the jury could have reasonably concluded all of the following: (1) appellant did not have a deadly weapon on or about his person and that he did not display, brandish, indicate he possessed, or use it; (2) appellant did not have a dangerous ordnance on or about his person or under his control; and (3) appellant did not inflict, or attempt to inflict serious physical harm to the victim.

{¶ 40} The evidence presented at trial indicated that appellant forced his way into J.T.'s home, shattered a glass in her face, and stabbed her multiple times.  Lykins testified he saw appellant leave the home with a knife.  It is undisputed that J.T. suffered serious physical injury and was hospitalized for over 30 days following the attack.  The only evidence to the contrary was appellant's own self-serving testimony which contained numerous inconsistencies and deviated greatly from his statements to police immediately following his arrest.  Given the overwhelming evidence at trial, the jury could not have reasonably found appellant not guilty of the greater offense of aggravated robbery but guilty of the lesser offense of theft.

{¶ 41} Notably, appellant does not challenge his attempted murder or felonious assault convictions, all of which include serious physical harm as a proven element. Appellant asks us to find plain error in the lack of lesser included offense instruction on the unsubstantiated theory that the theft was an entirely separate incident to all the other offenses committed while appellant was in the J.T.'s home that day.  The evidence at trial would not allow any reasonable jury to conclude that the theft was separate from and unrelated to all the other crimes, and, thus, it was not error, much less plain error, for the trial court not to give the lesser included offense instruction of theft as to the charge of aggravated robbery.  Thus, we overrule appellant's second assignment of error.

## V. Disposition

{¶ 42} Based on the foregoing reasons, the sufficiency of the evidence and the manifest weight of the evidence support appellant's convictions, and the trial court did not err in failing to give the lesser included offense instruction of theft for the offense of aggravated robbery.  Having overruled appellant's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT and CONNOR, JJ., concur.

————————————