[Cite as *State v. Magwood*, 2018-Ohio-1634.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 105885**

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**JONATHAN MAGWOOD**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED IN PART, REVERSED IN PART

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-611500-A

**BEFORE:** McCormack, J., E.A. Gallagher, A.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** April 26, 2018

**ATTORNEYS FOR APPELLANT**

Mark A. Stanton
Cuyahoga County Public Defender

By: Noelle A. Powell
Jeffrey Gamso
Assistant Public Defenders
310 Lakeside Ave., Ste. 200
Cleveland, OH 44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

By: Daniel A. Cleary
Assistant County Prosecutor
Justice Center, 8th Floor
1200 Ontario Street
Cleveland, OH   44113




TIM McCORMACK, J.:

{¶1}   Defendant-appellant Jonathan Magwood appeals his conviction for kidnapping, rape, and petty theft.   For the reasons that follow, we affirm in part and reverse in part.

I.   Procedural History

{¶2}   On November 17, 2016, Magwood was charged with three counts of rape in violation of R.C. 2907.02(A)(2), one count of kidnapping in violation of R.C. 2905.01(A)(4), with a sexual motivation specification, and petty theft in violation of R.C. 2913.02(A)(1).   The

charges stem from an incident that occurred on August 10, 2016, in a public restroom with one victim, "T.J."

{¶3} Following a bench trial, the court found Magwood guilty on all counts. The court then sentenced Magwood to 11 years imprisonment on each of the rape counts and 6 months on the petty theft count, and it noted that the kidnapping merged with the rape. The court ordered the sentences of the first two rape counts to be served consecutively, while the remaining sentences would be concurrent. The total aggregate prison term is 22 years.

II. Evidence at Trial

{¶4} At trial, the state presented the following witnesses: the victim, T.J.; Cleveland police officers, Maria Velez and Kerry Adams; Cleveland police detective, Morris Vowell; sexual assault nurse examiner ("SANE"), Angella McMahan; and Amanda Bushnell. The state also admitted the following exhibits, without objection: the 911 call; T.J.'s medical records, which included notes taken by the SANE nurse; the rape kit; and the video surveillance footage provided by Taco Bell. Magwood testified on his own behalf.

{¶5} T.J. testified that in the afternoon of August 10, 2016, she took the bus from her home in Lakewood to the area of W. 110th Street and Lorain Avenue in Cleveland to get money from her sister, who was working at the grocery store in the area's shopping plaza. She met with her sister for approximately 15 minutes and then walked to the nearby McDonald's to charge her cell phone, which was "completely dead," and to eat. While sitting in the McDonald's, Magwood approached T.J., said hello, and explained to T.J. that the outlets at McDonald's were not working. T.J. stated that Magwood eventually left McDonald's.

**{¶6}** T.J. then left McDonald's in order to find a place to charge her phone. While heading to the Subway restaurant, she noticed Magwood in front of Subway selling CDs. T.J. stated that he told her to go to the nearby Taco Bell to charge her phone.

**{¶7}** T.J. walked to Taco Bell. When she arrived, she proceeded to the ladies' restroom and locked the door. The restroom was near the front door where she entered. It was a single use restroom with one toilet and one sink. T.J. testified that before leaving the restroom, she noticed someone was trying to get into the restroom. Upon eventually opening the restroom door to leave, someone pushed the door open and entered the restroom. T.J. stated that this person locked the door and then "slammed" her face into the mirror above the sink and told her to keep quiet.

**{¶8}** T.J. then proceeded to testify how the man who pushed himself into the restroom raped her. He pulled her pants down to her ankles and took his own clothes off. He continued to hold her face to the mirror and told her to remain quiet when he placed his penis inside her, first anally and then vaginally, while she was bent over the sink. She repeated that her face was "still slammed into the mirror." One hand held her face to the mirror, while the other hand was around her waist, holding her. She stated that she wanted to move but she could not. T.J. stated that the man entered her anally and vaginally multiple times while repeatedly telling her to remain quiet. At some point, the man "threw" T.J. onto the floor. As she sat on the floor, she now recognized the man as Magwood, the individual who told her to go to Taco Bell. Magwood then put his penis in her mouth and ejaculated on her face and her shirt. He told her to "clean yourself up," and he left.

**{¶9}** T.J. testified that after Magwood left, she sat on the floor and cried. She stated that she "sat there until I figured out I needed to leave." She got dressed, left Taco Bell, and

headed to the adjacent Burger King to charge her phone that was still "dead," where she "broke down crying." T.J. stated that she got "weird looks" from the people in the restaurant, but she did not tell anyone what happened because she was too scared. After charging her phone, she left Burger King and called her friend, Amanda Bushnell ("Mandy").

**{¶10}** Mandy testified that T.J., who is her best friend, phoned Mandy "around 1:30ish" in the afternoon on August 10, while Mandy was getting ready for work. Mandy testified that T.J. only called, rather than texted, when it was "important." Mandy stated that at first, T.J. did not say anything, but when Mandy asked T.J. what was wrong, T.J. "burst into tears." Mandy became concerned because T.J. sounded "very scared" and "she seemed like she just wanted to disappear at this point." Mandy testified that T.J. then explained that she was raped in the Taco Bell restroom. Mandy told T.J. to call the police or she would call them for her. Mandy explained that T.J. was reluctant to call the police because "she was scared and she just didn't want to deal with anything and she didn't know what was going to happen."

**{¶11}** Mandy testified that she texted T.J. throughout the night of the incident to ensure that her friend was all right. She stated that during this entire time, T.J. was very scared and unsure of what was going to happen. Mandy also stated that after the rape, T.J. became depressed and began "pushing people away."

**{¶12}** After T.J. phoned her friend, she went to the rapid transit station and called 911.

**{¶13}** Officer Velez testified that on August 10, 2016, at approximately 3:15 p.m., she and her partner responded to a call from dispatch regarding a reported rape. When the officers arrived on the scene, they found T.J. inside the rapid transit station with the rapid transit officers. Officer Velez stated that T.J. seemed "shook up, scared, * * * uneasy" and when she asked T.J. what happened, T.J. "wasn't very willing to say what happened. She seemed scared to explain *

* *." T.J. eventually opened up to the officers, recounting the incident to them. Officer Velez testified that T.J. was emotional, crying at times, and seemed to be in shock. After speaking with T.J. for approximately three or four hours, Officer Velez drove T.J. to the hospital for a SANE examination. The officer noted that while waiting for the nurse, T.J. seemed to be on an "emotional roller coaster," because she was alternating between crying and keeping to herself.

{¶14} Officer Adams testified that he and his partner also responded to the dispatcher's report of a rape. Officer Adams stated that when they arrived at the rapid station, he observed Officer Velez and her partner speaking with the victim, who appeared scared and shy. Officer Adams obtained information concerning the reported rape and proceeded to the Taco Bell, where the rape was reported to have occurred hours earlier. The officer was able to view the video surveillance footage from the restaurant from that afternoon. After observing the surveillance, the officers canvassed the area for the suspect to no avail.

{¶15} At Fairview Hospital, SANE nurse, Angella McMahan, obtained T.J.'s history, or "narrative," of what happened earlier in the day. She explained that obtaining a victim's history is important because it guides the nurse's examination and treatment of the patient. The nurse observed that T.J. was "very quiet," she would pause many times while explaining to the nurse what happened, looking away or looking at the floor as she talked, she was "tearful," and "[s]ometimes she just had to stop and couldn't keep speaking." McMahan documented T.J.'s narrative, during which T.J. reported that she had been raped in a Taco Bell restroom in Cleveland.

{¶16} During her testimony, McMahan read T.J.'s narrative aloud:

Patient states, "It happened today (8/10/16) between 12:30-1:30 p.m. I was followed into the Taco Bell bathroom and I was raped. * * * I was going into the Taco Bell to charge my phone. They did not have a place that I could charge my

phone at the McDonald's. I was at the McDonald's before * * *. I did not want to travel without my phone.

I went into the bathroom to the right at Taco Bell. Someone was knocking. It is a bathroom for one person. The guy pushed himself in. I was thrown onto the sink and he pulled down my pants and that's when it all started. Uh, I was raped both ways."

[Patient] now quiet and teary eyed. [Patient] unable to speak. SANE RN assured [patient] that she could take her time. SANE RN asked [patient] what do you mean by raped both ways? [Patient] states, "He put his penis in my vagina and my butt. He also put his penis in my mouth. He threw me to the ground. When he threw me to the ground he put it ([patient] referring to assailant's penis) in my mouth and grabbed my face.

I tried to push him away and it wouldn't work. He was crouched over me." [Patient] is quiet again, and teary eyed. SANE RN asked [patient], did he ejaculate? [Patient] states, "Yep, in front of me with his penis in his hand, all over my face and shirt." SANE RN asked [patient] if assailant licked, kissed, or bit her anywhere? [Patient] states, "No." [Patient] quiet again. [Patient] states, "He was black. He kept telling me 'to be quiet.' He had a book bag on and he was taller than me. When he was done he said, "Now you have to clean yourself up.' I threw up afterwards two times. I ran to Burger King down the street. I had to get my phone on. I charged my phone. I didn't know what to do. After I took the bus to the rapids. My friend told me to call the cops. We called the cops. The cops brought me here (FGH) from the rapid."

SANE RN asked [patient] if there was anything else? [Patient] states, "I was bleeding vaginally and rectally after he did that." SANE RN asked [patient] when was your last menstrual period? [Patient] states, "Last week. My period already stopped."

{¶17} Thereafter, at the end of the narrative, McMahan recorded as follows:

After exam and collection of SAEC kit, [patient] states, "He followed me from McDonald's. I remember seeing him at McDonald's first. He took my money, a little less than $50 and my debit card." SANE RN asked [patient] if there was anything else she wanted to share? [Patient] states, "No."

{¶18} The SANE nurse then testified that it is common for patients to relay information out of sequence during the examination, because

> there's a neurobiologic response to trauma and your thoughts can be scattered; you may not remember every detail from A to Z. You might skip from point A to point K, back to point B. Sometimes things will trigger their memory that we do during the exam or after an exam, and they will just suddenly utter something that they remembered that they did not remember when they gave us their history.

{¶19} McMahan stated that T.J. consented to an examination and photographs, but she declined any photographs of her genital region. McMahan testified that T.J. complained of lower right pelvic and abdominal pain. Based upon T.J.'s complaint and the information provided in her narrative, McMahan performed her examination of T.J.

{¶20} During the examination, the Woods lamp revealed evidence of semen on T.J.'s face, by her left eye, her upper and lower lips, and on the left and right sides of her nose. McMahan swabbed those areas, as well as the genitalia, to submit as part of the sexual assault evidence collection kit. The exam also revealed an injury to an area of the vagina known as the fossa navicularis, which can be indicative of resistance from a female, where the penis can cause "blunt force trauma" to that area of the body. McMahan testified that in sexual assaults, if there is injury, this area is "the most generalized area of injury." Finally, the exam revealed generalized vaginal bleeding but no accompanying cervical lacerations.

{¶21} Detective Vowell took T.J.'s statement approximately one week after the incident. He testified that she was crying, upset, and very emotional during the statement. At one point, the detective turned off the recorder and called a rape advocate to sit with T.J. because she was "crying and upset and sh[a]ken up." When T.J. regained her composure, the detective continued with the interview.

{¶22} As part of his investigation, Detective Vowell obtained the video surveillance footage from Taco Bell and the sexual assault evidence kit collected by the SANE nurse. Through the DNA obtained from the sexual assault kit, Detective Vowell identified Magwood as a suspect, and T.J. later identified Magwood from a photo array as the person who attacked her.

{¶23} Magwood testified on his own behalf. He stated that he had a very forward conversation with T.G. when he met T.J. for the first time at the shopping plaza where he was bootlegging CDs, and T.J. agreed to meet him in the men's restroom at the Taco Bell for sex. He stated that he followed T.J. to Taco Bell and looked for her in the men's restroom, but it was occupied. He noted that he used the men's room and then proceeded to the women's restroom to look for T.J., assuming she went there instead. Magwood then claimed that he and T.J. proceeded to have consensual sex.

{¶24} On cross-examination, Magwood acknowledged that he initially told the detective in his statement that he and T.J. walked to the Taco Bell together. And when the prosecutor asked if Magwood agreed that he never told the detective that he arranged to meet T.J. in the men's restroom, Magwood replied that he "really [did not] remember the exact details, like, I'm sayin' that we walked there together because I'm tryin' to get him to realize this was consensual." Magwood acknowledged that "having sex in a Taco Bell bathroom" is not something he did every day, yet it was "not something I really remember."

{¶25} The state then played the surveillance video from Taco Bell. The video showed Magwood entering the restaurant after T.J. And upon entering the restaurant, the video depicted Magwood attempting to open the door to the women's restroom first, not the men's restroom, contrary to Magwood's testimony. Finally, the video footage does not support Magwood's

testimony that he used the men's restroom prior to entering the women's restroom. Magwood was unable to explain the inconsistencies, stating that he "didn't recall exactly."

### III. Assignments of Error

I. Jonathan Magwood's conviction is against the manifest weight of the evidence and, accordingly, Magwood was denied his fundamental right to a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

II. Jonathan Magwood was improperly convicted of petty theft when the only evidence of the offense was inadmissible hearsay.

III. The court violated Mr. Magwood's rights to a fair sentencing proceeding and to be sentenced strictly in accordance with the sentencing statutes when it imposed maximum sentences for each of three counts of rape and when it made consecutive the sentences for two of those three counts.

### IV. Manifest Weight

**{¶26}** In his first assignment of error, Magwood argues that his conviction for rape was against the manifest weight of the evidence. Primarily, he argues that the victim is not credible, as her account of the incident is "full of exaggerations, inconsistencies, and absurdities that it is clear she was lying." Magwood essentially contends that the encounter was consensual; the evidence does not support the victim's testimony, especially as it relates to the alleged force that Magwood used; the victim did not immediately seek help or report the rape; and the victim's version of the events is not plausible, especially given the video surveillance.

**{¶27}** A manifest weight challenge questions whether the state has met its burden of persuasion. *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). When reviewing a manifest-weight claim,

"[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶28}** "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. When examining witness credibility, the choice between witnesses and their conflicting testimony rests solely with the finder of fact, and a reviewing court may not substitute its own judgment for that of the factfinder. *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). The factfinder has the benefit of viewing the witnesses and observing their demeanor, gestures, and voice inflections and to use these observations to weigh credibility. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). And a factfinder is free to believe all, some, or none of the testimony of each witness appearing before it. *State v. Ellis*, 8th Dist. Cuyahoga No. 98538, 2013-Ohio-1184, ¶ 18. Moreover, "'a conviction is not against the manifest weight of the evidence simply because the [factfinder] rejected the defendant's version of the facts and believed the testimony presented by the state.'" *State v. Jallah*, 8th Dist. Cuyahoga No. 101773, 2015-Ohio-1950, ¶ 71, quoting *State v. Hall*, 4th Dist. Ross No. 13CA3391, 2014-Ohio-2959, ¶ 28.

{¶29} Magwood was convicted of three counts of rape in violation of R.C. 2907.02(A)(2), which provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶30} Here, T.J. testified that Magwood pushed his way into the women's restroom, locked the door, and forcibly and repeatedly entered her vaginally, anally, and orally. She stated that he held her face to the mirror, told her to keep quiet, and held her around the waist to the point where she could not move, despite her desire and her efforts to escape. T.J. testified that after the rape occurred, and as soon as she "figured out [she] needed to leave," she left Taco Bell and went to a nearby restaurant where she was finally able to charge her cell phone. She stated that while charging her phone, she broke down and cried, but she was too afraid to tell anyone what happened. When her phone had been charged, she called her best friend and told her what happened.

{¶31} In his defense, Magwood contends that the sexual acts were consensual. In support, he essentially attacks T.J.'s credibility, stating, among other things, that if she did, in fact, experience hip pain from being slammed into the sink that she would have evidence of a bruise in that area, which she did not provide. He also contends that T.J. would not have had enough time to vomit twice in the sink, sit and cry, wash her face, and get dressed, in the minute between the time the video showed him leaving the restroom and T.J. leaving the restaurant thereafter. Magwood also questions T.J. for not calling out for help and for not immediately reporting the rape.

{¶32} In this case, where both the defendant and the victim testified, their testimony necessarily invokes a credibility determination. The choice between witnesses and their

conflicting testimony, however, rests solely within the province of the trier of fact, and we are not permitted to substitute our judgment for that of the factfinder. In choosing between witnesses and the conflicting testimony here, the factfinder (in this case, the trial judge) found the victim's testimony more credible than the defendant's. In fact, the court found Magwood's testimony not credible, taking issue with "multiple inconsistent statements about [Magwood's] version of what took place." The factfinder was free to believe T.J.'s version of the events. And it is well settled that a rape conviction may rest solely on the victim's testimony, if believed. *State v. Patterson*, 8th Dist. Cuyahoga No. 100086, 2014-Ohio-1621, ¶ 40.

{¶33} T.J.'s testimony, however, was also significantly supported by the testimony of other witnesses. Mandy, T.J.'s best friend, testified that T.J. phoned her around 1:30 in the afternoon on August 10, "burst[ing] into tears" and sounding "very scared, * * * seem[ing] like she just wanted to disappear," as she explained to Mandy what happened. Officers Velez and Adams also testified that T.J. was "shaken" and "scared" when they responded to the call from dispatch, which was approximately two hours after T.J. had spoken with Mandy. Officer Velez testified that T.J. eventually opened up about the rape, but she was "emotional, crying at times, and seemed to be in shock." Detective Vowell testified that T.J. was so upset and emotional one week after the incident when he was taking her statement that he had to obtain a rape advocate to help T.J. because she was "crying and upset and sh[a]ken up."

{¶34} Finally, the SANE nurse testified that when T.J. presented herself for an examination, T.J. was "very quiet," she would pause many times while explaining to the nurse what happened, looking away or looking at the floor as she talked, she was "tearful," and oftentimes she could not keep speaking. T.J. told her that the rape occurred "between 12:30 and 1:30 p.m." The nurse also testified that T.J. suffered an injury to her vagina that can be

indicative of resistance. Finally, the narrative that the SANE nurse included in T.J.'s medical records was consistent with T.G.'s testimony at trial.

{¶35} After reviewing the record and deferring to the trier of fact's credibility assessment, we are unable to conclude that the trier of fact lost its way and created such a manifest miscarriage of justice that a new trial is warranted.

{¶36} Magwood's first assignment of error is overruled.

V. Hearsay Testimony

{¶37} In his second assignment of error, Magwood challenges his conviction for petty theft. He contends that his conviction for theft of T.J.'s money and credit card was based upon the inadmissible hearsay testimony of the SANE nurse. In support, Magwood argues that the nurse's recitation of the patient narrative that included T.J.'s statement concerning the theft were not made for the purposes of medical diagnosis or treatment and therefore did not fall within the hearsay exception under Evid.R. 803(4).

{¶38} A trial court has broad discretion to determine whether a declaration should be admissible under a hearsay exception. *State v. Dever*, 64 Ohio St.3d 401, 410, 596 N.E.2d 436 (1992). A trial court abuses its discretion when it renders a decision that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

{¶39} Hearsay is an out-of-court statement offered for the truth of the matter asserted. Evid.R. 801(C). Hearsay is inadmissible unless it falls within a specific exception outlined in the rules of evidence. Evid.R. 802.

{¶40} One of the exceptions to the hearsay rule is outlined in Evid.R. 803(4). "Statements made for the purposes of medical diagnosis and treatment are a clearly defined,

long-standing exception to the rules of hearsay." *State v. Echols*, 8th Dist. Cuyahoga No. 102504, 2015-Ohio-5138, ¶ 27, citing Evid.R. 803(4). This rule provides an exception for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Additionally, "'courts have consistently found that a description of the encounter and identification of the perpetrator are within [the] scope of statements for medical treatment and diagnosis.'" *Echols*, quoting *In re D.L.*, 8th Dist. Cuyahoga No. 84643, 2005-Ohio-2320, ¶ 21, citing *State v. Stahl*, 9th Dist. Summit No. 22261, 2005-Ohio-1137, ¶ 15.

{¶41} Courts must therefore decide whether challenged statements are pertinent to diagnosis or treatment of the witness. *State v. Schultz*, 8th Dist. Cuyahoga Nos. 102306 and 102307, 2015-Ohio-3909, ¶ 17, citing *State v. Chappell*, 97 Ohio App.3d 515, 531, 646 N.E.2d 1191 (8th Dist.1994). In examining the admissibility of hearsay statements under Evid.R. 803(4), "the primary inquiry is whether the statements were made for the purposes of medical diagnosis or treatment, as opposed to some other purpose." *State v. Simmons*, 8th Dist. Cuyahoga No. 98613, 2013-Ohio-1789, ¶ 22, citing *Fields v. CSX Transp., Inc.*, 197 Ohio App.3d 561, 2011-Ohio-6761, 968 N.E.2d 70, ¶ 17 (8th Dist). And if a statement is made for purposes of diagnosis or treatment, pursuant to Evid.R. 803(4), it is admissible. *Dever*, 64 Ohio St.3d at 414, 596 N.E.2d 436.

{¶42} Here, McMahan, the SANE nurse, testified that as part of her examination of a sexual assault victim, she must obtain a victim's history, or narrative, which is a victim's explanation of what brought her to the emergency room. McMahan stated that the patient's history is important because it guides the nurse's examination and treatment of the patient. In

this case, she documented T.J.'s statements in T.J.'s medical records, and the records were admitted into evidence without objection. Upon the prosecutor's request, McMahan read T.J.'s detailed account of her rape into the record. Once again, defense counsel did not object. Because counsel did not object to the statement, we review for plain error.

{¶43} To show plain error, pursuant to Crim.R. 52(B), "the defendant must demonstrate that the trial court deviated from a legal rule, the error was an obvious defect in the proceeding, and the error affected a substantial right." *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Under Crim.R. 52(B), appellate courts have the discretion to correct "plain errors or defects affecting substantial rights" notwithstanding the defendant's failure to bring the alleged errors to the trial court's attention. *Id.* We recognize plain error ""with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice."" *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 23 (under a plain error review, a mistake by the trial court is not reversible error unless reversal is necessary to correct a manifest miscarriage of justice), quoting *Barnes* at 27, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus; *State v. Nickens*, 8th Dist. Cuyahoga No. 104670, 2017-Ohio-1448, ¶ 5.

{¶44} Here, the record shows that the SANE nurse read T.J.'s narrative into the record while testifying. The entire narrative, with the exception of the last paragraph, includes a detailed description of the rape and is undoubtedly made for the purposes of medical diagnosis or treatment.

{¶45} The last paragraph, however, which states, "[a]fter exam and collection of SAEC kit, [patient] states, 'He followed me from McDonald's. I remember seeing him at McDonald's first. He took my money, a little less than $50 and my debit card,'" cannot be considered a

statement made for the purposes of medical diagnosis or treatment or guide the nurse's examination and treatment of the patient. First, by the nurse's own words, the examination and collection of the rape kit had been completed before T.J. mentioned the theft. Second, T.J.'s statement regarding the theft that purportedly occurred after the assault bore no connection to T.J.'s account of the rape itself. Under these circumstances, it is not reasonable to expect that a SANE nurse would rely on such a statement — one that lacks any medical significance — in her diagnosis or treatment of a patient. T.J.'s statement regarding the theft is therefore not protected by the hearsay exception of Evid.R. 803(4) and was improperly admitted.

{¶46} Because T.J. did not testify at trial regarding the theft of her money and debit card, and this narrative statement read into the record by the SANE nurse is the only evidence of the alleged theft, we find that the outcome of the trial concerning the charge of petty theft would have been different had this statement been excluded from the narrative at trial. We therefore must find the trial court's admission of this portion of the narrative amounted to plain error, and Magwood's conviction for petty theft in violation of R.C. 2913.02(A)(1) must be reversed.

{¶47} Magwood's second assignment of error is sustained.

VI. Sentence

{¶48} In his third assignment of error, Magwood contends that the trial court erred in imposing maximum sentences for each rape count and ordering two of the sentences to be served consecutively, arguing that the record does not support the sentence.

{¶49} In reviewing felony sentences, we do not review the sentence for an abuse of discretion; rather, we apply the standard of review set forth in R.C. 2953.08(G)(2). *State v. Wright*, 8th Dist. Cuyahoga No. 106175, 2018-Ohio-965, ¶ 9; *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 9. Under R.C. 2953.08(G)(2), an appellate court may

increase, reduce, modify a sentence, or vacate and remand for resentencing if we clearly and convincingly find that the record does not support the sentencing court's statutory findings under R.C. 2929.14(C)(4) or the sentence is contrary to law. *State v. Johnson*, 8th Dist. Cuyahoga No. 102449, 2016-Ohio-1536, ¶ 9.

{¶50} A sentence is contrary to law if it falls outside the statutory range for the particular degree of offense or if the trial court fails to consider the purposes and principles of felony sentencing set forth in R.C. 2929.11 and the sentencing factors set forth in R.C. 2929.12. *State v. Pawlak*, 8th Dist. Cuyahoga No. 103444, 2016-Ohio-5926, ¶ 58. Additionally, the imposition of consecutive sentences is contrary to law if a trial court fails to make the findings mandated by R.C. 2929.14(C)(4). *State v. Morris*, 2016-Ohio-7614, 73 N.E.3d 1010, ¶ 24 (8th Dist.), citing *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37.

A.   Maximum Sentences

{¶51} Magwood challenges the trial court's imposition of maximum sentences for each of the rape counts. Although he acknowledges the 11-year sentences are within the statutory range for rape, he essentially argues that the sentence is not supported by the record.

{¶52} A trial court's imposition of a maximum term of imprisonment for a felony conviction is not contrary to law as long as the sentence is within the statutory range for the offense and the court considers the purposes and principles of felony sentencing outlined in R.C. 2929.11 and the seriousness and recidivism factors outlined in R.C. 2929.12. *Wright*, 8th Dist. Cuyahoga No. 106175, 2018-Ohio-965, at ¶ 16; *State v. West*, 8th Dist. Cuyahoga No. 105568, 2018-Ohio-956, ¶ 9, 10 (stressing a trial court's "full discretion" to impose the maximum sentence as long as the sentence is within the statutory range and the court considered the relevant statutory purposes and guidelines).

**{¶53}** R.C. 2929.11(A) provides that the overriding purposes of felony sentencing are (1) to protect the public from future crime by the offender and others; and (2) to punish the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources. Further, the sentence imposed shall be "commensurate with and not demeaning to the seriousness of the offender's conduct and its impact on the victim, and consistent with sentences imposed for similar crimes by similar offenders." R.C. 2929.11(B).

**{¶54}** The court that imposes a felony sentence has the discretion to determine the most effective way to comply with the purposes and principles of sentencing as outlined above. R.C. 2929.12(A); *State v. Switzer*, 8th Dist. Cuyahoga No. 102175, 2015-Ohio-2954, ¶ 10. In exercising this discretion, however, the sentencing court must consider a statutory list of factors regarding the seriousness of the offender's conduct and the likelihood of recidivism, as well as any other factors relevant to achieving these purposes and principles of sentencing. *See* R.C. 2929.12; *Switzer*. These factors include the physical, psychological, or economic harm suffered by the victim; the defendant's prior criminal record; whether the defendant was under a court sanction at the time of the offense; whether the defendant shows any remorse; and any other relevant factors. R.C. 2929.12(B) and (D).

**{¶55}** Although the trial court has a mandatory duty to "consider" the statutory factors under R.C. 2929.11 and 2929.12, the court is not required to engage in any factual findings under R.C. 2929.11 or 2929.12. *State v. Keith*, 8th Dist. Cuyahoga Nos. 103413 and 103414, 2016-Ohio-5234, ¶ 11. Indeed, consideration of the statutory factors is presumed unless the defendant affirmatively demonstrates otherwise. *Id.* Moreover, a trial court's statement in its sentencing journal entry that it considered the required statutory factors sufficiently fulfills its

obligations under R.C. 2929.11 and 2929.12. *Wright*, 8th Dist. Cuyahoga No. 106175, 2018-Ohio-965, at ¶ 16; *West,* 8th Dist. Cuyahoga No. 105568, 2018-Ohio-956, at ¶ 11.

**{¶56}** Before imposing sentence, and in the context of addressing Magwood's prior criminal history, the court stated, "[w]ith that type of predatory behavior that I saw on the video, it's hard to believe that there may not be other victims out there." Magwood claims that the court's purported belief that Magwood had raped other women "clearly influenced the sentence." However, immediately after making such comment, the court stated that it cannot take that into consideration in sentencing Magwood. Moreover, we find nothing in the record suggesting the court based its sentence on any improper considerations.

**{¶57}** At sentencing, the court noted that it reviewed the presentence investigation report, the mitigation of penalty report, and the presentence investigation reports from a prior case. The court then heard from defense counsel, Magwood, and the state. Defense counsel stated that Magwood has "somewhat of a prior criminal record." Counsel also provided that Magwood "has been raised kind of pathetically," having been "deprived of normal parenting"; however, he acknowledged that the "report says the psychological/psychiatric factors were not relative as far as this offense." He noted that Magwood has consistently stated that he and T.J. had consensual sex in the Taco Bell bathroom.

**{¶58}** Thereafter, the prosecutor advised the court that the video surveillance at Taco Bell revealed Magwood's predatory behavior, where Magwood can be seen following T.J., keeping a safe distance from her as she entered the restaurant, and then looking for her once inside the restaurant. The prosecutor noted that Magwood's actions were "completely degrading," and like a predator, he then walked away "like nothing happened." The prosecutor advised the court that Magwood committed the rapes while wearing a "SCRAM device" because he was on

probation out of Akron. And while acknowledging Magwood's felony criminal history is not long, there are numerous misdemeanors. Referring to the mitigation report, the prosecutor noted that "[n]othing mitigates his behavior in this case."

{¶59} Magwood addressed the court, insisting that "the whole situation don't make no sense" and he questioned the victim's motives in reporting a rape. The court then addressed Magwood's version of the incident and discussed Magwood's "multiple inconsistent statements," as well as the video surveillance footage and Magwood's "predatory behavior." The court noted that T.J. broke down several times during her testimony, and as a result of the assault, she had been receiving counseling. The court also noted that Magwood failed to take any responsibility for his actions. Finally, the court addressed Magwood's prior criminal history, specifically commenting on Magwood's denial of any wrongdoing in the robbery case. Before imposing sentence, the court noted that Magwood was guilty of "one of the most heinous forms of the offense," noting the victim was a stranger.

{¶60} Based upon the foregoing, we find the trial court did, in fact, consider the principles and purposes of felony sentencing outlined in R.C. 2929.11 and the sentencing factors outlined in R.C. 2929.12 prior to sentencing. Moreover, the court's sentencing journal entry states that the court considered all the required factors of law and it found that prison is consistent with the purpose of R.C. 2929.11. We therefore cannot say the trial court's imposition of a maximum sentence on the rape charges is unsupported by the record or is contrary to law.

B. Consecutive Sentence

**{¶61}** Magwood also challenges the trial court's imposition of consecutive sentences on two of the rape charges. He claims that the record does not support consecutive sentence findings, citing "the same reasons maximum sentences are * * * not supported by the record."

**{¶62}** In order to impose consecutive sentences, the trial court must make findings set forth in R.C. 2929.14(C)(4) and incorporate those findings into the journal entry of sentence. *Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, at ¶ 37.

**{¶63}** R.C. 2929.14(C)(4) provides that the trial court must find that consecutive sentences are necessary to protect the public from future crime or to punish the offender, that such sentences would not be disproportionate to the seriousness of the conduct and to the danger the offender poses to the public, and that one of the following applies:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under postrelease control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶64}** A trial court is not required to engage in "a word-for-word recitation" of the statutory language set forth in R.C. 2929.14(C)(4). *Bonnell* at ¶ 29. Rather, "as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Id.*

**{¶65}** Here, the trial court stated that it had devised a sentence "that protects the community against what you did * * *. Against you." The court continued:

> The state has requested the court consider consecutive prison terms. The presumption is concurrent terms with court discretion to impose consecutive sentences if necessary to protect and punish, not disproportionate. The court must find that the crime was committed while awaiting trial, sentencing, under sanction or under postrelease control. That's not the case here.
>
> Two or more multiple offenses committed as a single course of conduct, and the harm was so great or unusual that the single term does not adequately reflect the seriousness of the offense; or the offender's criminal history shows consecutive terms are needed to protect the public. The court finds that those two prongs are met * * *.

**{¶66}** As previously addressed in this opinion, we noted that the trial court reviewed the presentence investigation report and the sentencing mitigation report. It also heard from the defendant, defense counsel, and the state. The prosecutor advised the court that the victim was not "quite up to" providing a statement for the court at Magwood's sentencing. The prosecutor further outlined the details of Magwood's "predatory" behavior and how his attack upon the victim in the middle of the day was "completely degrading."

**{¶67}** Later in the sentencing, the court reiterated the facts of the case, noting that even in Magwood's version of the purported consensual sex, he pushed the victim to the ground and told her to get on her knees. The court addressed Magwood's "predatory behavior" as revealed by the video surveillance. The court also noted the effect the rape had on the victim, stating that she had to undergo three to four hours of a SANE examination and "getting her whole body invaded by people she doesn't know, * * * never knowing at that point that they will ever be able to catch you or find you."

**{¶68}** Prior to imposing sentence, the court noted the difficulty the victim had in testifying:

[She] doesn't fly through her testimony, [she] has to stop multiple times, breaking down. And this is in the context of a person who has spent the time from then until now in counseling for what happened, not knowing if you will ever be caught. She started counseling.

**{¶69}** Finally, the court addressed Magwood's prior criminal history. It specifically discussed Magwood's prior robbery conviction, noting that Magwood was "very uncooperative and eventually had to be tasered" because he was attempting to flee the police, and he was "screaming, kicking, and spitting."

**{¶70}** Additionally, we note that although the trial court stated that the consecutive sentence finding under R.C. 2929.14(C)(4)(a) — defendant committed the offense while under a court-imposed sanction had not been satisfied — we disagree. The record shows that Magwood was on probation at the time he committed the rapes. While testifying on his own behalf, Magwood stated that approximately six months prior to the events of August 10, 2016, he was placed on a "SCRAM bracelet" for a misdemeanor assault by an Akron court.

**{¶71}** In light of the foregoing, we cannot "clearly and convincingly" find that the record does not support the trial court's consecutive sentence findings.

**{¶72}** Magwood's third assignment of error is overruled.

**{¶73}** Judgment reversed with respect to the defendant's conviction for petty theft under count four. Judgment affirmed as to the remainder of the trial court's judgment.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
TIM McCORMACK, JUDGE

EILEEN A. GALLAGHER, A.J., and
SEAN C. GALLAGHER, J., CONCUR`