[Cite as *State v. Harris*, 2020-Ohio-1497.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                            No. 108377

    v.                                      :

DWAYNE HARRIS,                          :

    Defendant-Appellant.         :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 16, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-630253-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Aqueelah A. Jordan, Assistant Prosecuting Attorney, *for appellee.*

Rick L. Ferrara, *for appellant.*

MICHELLE J. SHEEHAN, J.:

{¶ 1} Defendant-appellant Dwayne Harris ("Harris") appeals from his convictions for two counts of gross sexual imposition ("GSI") and two counts of

kidnapping. Because we find sufficient evidence supports the convictions and the convictions are not against the manifest weight of the evidence, we affirm.

I. Procedural History

{¶ 2} On July 5, 2018, Harris was charged in a 19-count indictment, including five counts of rape (Counts 1, 3, 5, 12, and 14); nine counts of kidnapping (Counts 2, 4, 6, 9, 11, 13, 15, 17, and 19); and five counts of GSI (Counts 7, 8, 10, 16, and 18). With the exception of Count 13, the kidnapping charges included a sexual motivation specification. And with the exception of Counts 5, 12, 14, 16, and 18, the remaining charges included a sexually violent predator specification. The indictment involves three young sisters who were less than 13 years of age at the time the alleged sexual conduct occurred: K.P. (d.o.b. February 13, 2007), H.P. (d.o.b. February 2, 2009), and R.P. (d.o.b. September 2, 2010). Harris was dating the children's mother, A.P. ("Mother"), at the time the alleged conduct occurred.

{¶ 3} On January 23, 2019, the matter proceeded to a bench trial. The state presented the testimony of K.P., the alleged victim; Mother; Kimberly Foley, social worker with University Hospitals; Kathleen Hackett, pediatric SANE nurse at Rainbow Babies and Children's Hospital; Hristina Lekova, DNA analyst with the Cuyahoga County Medical Examiner's Office; and Cleveland Police Detective Richard Tusing.

{¶ 4} At the close of the state's case, the state voluntarily dismissed Counts 8, 12, 13, 18, and 19 (charges involving all three children). And following the defense's Crim.R. 29 motion, the court dismissed Counts 14 and 15 (charges

involving H.P.). At the conclusion of trial, the court found Harris not guilty in Counts 1-6, 16, and 17 (charges involving K.P. and H.P.). The court found Harris guilty in Counts 7, 9, 10, and 11, all of which involved K.P. The state agreed to merge Count 7 with Count 9 and Count 10 with Count 11, and it elected to proceed to sentencing on Counts 7 and 10. The court then sentenced Harris to 10 years to life in prison on Count 10 and 3 years on Count 7, to be served concurrently.

{¶ 5} Harris now appeals his conviction in the remaining four counts, raising two errors for our review: (1) the manifest weight of the evidence did not support a conviction (concerning all four counts); and (2) insufficient evidence supported his convictions (concerning Counts 7 and 9).

## II. Substantive Facts

{¶ 6} K.P. (or "the victim") was 11 years old at the time of trial. She testified that Harris moved into her home in October 2016, when she was 9 years old. She lived with her mother, her aunt, her grandmother, her brothers, and her sisters. After Harris moved in, K.P.'s aunt and grandmother left and her mother returned to work outside the home, which made K.P. sad.

{¶ 7} K.P. stated that Harris was in charge of the children when her mother was working. During this time, when K.P. was home with Harris, she sometimes played video games with Harris in her mother's bedroom. K.P. testified that one day in the summer of 2017, while her mother was working, Harris pulled K.P.'s pants down in the bedroom and "tried to touch" her "between [her] legs, put[ting] his fingers in my private part." K.P. then described her private part as the area

below her stomach and above the top of her leg, specifically stating it is the area she uses when she goes to the bathroom. She explained that Harris put his fingers on the outside and the inside of her "private part." When Harris did this, K.P. told him to "get off of [her]." K.P. stated that when she told him to stop, he did not always stop. When she was able to move away from him, she ran down the stairs. K.P. testified that she did not tell her mother what happened right away because she was afraid Harris might "do something," because Harris was "muscular" and "has tattoos."

{¶ 8} K.P. testified that on a "different day" that same summer, Harris called K.P. into her mother's bedroom. She listened to him because she was taught to "respect adults." K.P. stated that Harris pulled her arm and asked if she wanted to "play a game," to which K.P. replied, "no." She stated that, for approximately two minutes, he tried to put his "private part in her private part," but ultimately, his private part was only on the outside of her private part. She told him to "get off" of her and she pinched and scratched him, because he was "holding her" and "forcing down on [her]." K.P. stated that she screamed for help, and her younger sisters "came on the steps but [were] scared to come up."

{¶ 9} Once again, K.P. testified regarding an incident that occurred during the summer of 2017, when she was 10 years old, and she and Harris were in her mother's bedroom playing a game. This time, according to K.P., Harris "put his mouth" on her "chest," which she described as the area below her head and above her stomach. K.P. testified that Harris pushed her shirt and bra up and began to

"lick" her chest. She stated that it "didn't feel right" and she told Harris to "stop" and "get off." K.P. did not tell her mother.

{¶ 10} K.P. also testified regarding an incident in 2018 that occurred while she was in the basement with Harris. K.P. was cleaning the basement with her siblings because her younger brother had ripped up some foam and it was all over the basement. She stated that it was difficult to clean up because it "kept flying away." Her siblings decided they were finished and went upstairs, but according to K.P., Harris told her that she was not finished. After K.P.'s siblings left, Harris pulled K.P. over to the couch where he was sitting and he put his hands in her pants and began touching the outside of her "private part." K.P. told him to "stop, get off of [her]," and she ran very fast upstairs and hid in the closet. Harris followed K.P. upstairs and found her in the closet. According to K.P., Harris told Mother that K.P. ran upstairs to avoid cleaning the basement. K.P. then returned to the basement with Harris and her mother, where Harris "banged [K.P.'s] head against the poll and then "start[ed] choking [her]." At this point, K.P. began to cry and told Mother that Harris had been touching her.

{¶ 11} K.P. testified that the next day, while Harris was working, Mother moved K.P., her siblings, and her grandmother to K.P.'s aunt's house. The day after, Mother took K.P. to the hospital for an examination, where K.P. spoke with a nurse, a social worker, and a police detective. K.P. told them what had happened with Harris.

{¶ 12} Mother testified that she began a relationship with Harris in 2016 and by the end of the year, he began living at her home. In March 2017, she began working outside the home and the children's grandmother began watching the children. In July 2017, the grandmother moved out and Harris began watching the children while Mother worked. On June 24, 2018, while Mother was sitting on the couch with her baby, she saw K.P. run upstairs from the basement after all of her other children had come up, and she saw Harris follow K.P. upstairs. According to Mother, Harris explained that K.P. had not finished her basement chores. Thereafter, Harris, Mother, and K.P. returned to the basement, where Mother saw all the foam on the floor. Mother stated that she "had [her] head turned, [and] was looking another way" and then saw Harris grab K.P. "by the shirt," and they were "tussling." Mother told Harris to "let her go." At this point, K.P. was "crying * * * upset * * * and scared," which was unusual for K.P. Mother stated that K.P. then told her what had previously happened and Mother was "shocked" and began to cry as well. Mother testified that she asked Harris to leave and he refused. Mother said that she felt threatened, so she waited until Harris left the house the next day to move her children out of the home. Mother then brought K.P. to the hospital.

{¶ 13} While at the hospital, Kimberly Foley, University Hospitals social worker, was first to meet with K.P. Foley testified that she makes recommendations based upon what an alleged victim reports to her, and if there are reports of "skin to skin sexual contact within 72 hours," she will recommend the alleged victim receive an examination. Foley testified that based upon what

K.P. told her, Foley referred K.P. to the SANE nurse for an examination. Foley further testified that after having a conversation with K.P. and meeting with the medical treatment team, Foley telephoned the Department of Children and Family Services and the police. Foley included her notes in K.P.'s medical records.

{¶ 14} Kathleen Hackett, Pediatric SANE nurse, testified that on June 25, 2018, she examined K.P. Nurse Hackett compiled a report based upon her examination of K.P., and she testified that during the examination, K.P. had reported to her that "yesterday" Harris put his hands in her pants and touched her private parts. K.P. also reported that "last summer" Harris put his mouth on her chest area. Nurse Hackett asked K.P. to circle on the female diagram the areas she had been touched, and K.P. circled a picture of the vaginal area and the breast or chest area. K.P. did not circle any body part on the back side of the diagram or the mouth.

{¶ 15} Nurse Hackett testified that she submitted for analysis the underwear K.P. was wearing at the time of her examination, but she did not have the underwear that K.P. was wearing during the alleged incident the previous night. Nurse Hackett explained that it is possible to collect "touch DNA" on the underwear K.P. was wearing the following day because "skin cells still slough off" and "if there's any DNA [it] could still fall onto those underpants, especially for kids."

{¶ 16} Hristina Lekova, the DNA analyst with the medical examiner's office, analyzed the DNA collected from the inside crotch area of K.P.'s underpants that

were submitted by Nurse Hackett. Lekova observed a mixture of unknown male DNA profiles from this sample. Lekova testified that, due to the location of the DNA and the amount of DNA collected, it was likely that the DNA was actual "touch DNA" and not "transfer DNA," which is a secondary source.

{¶ 17} Detective Tusing interviewed K.P. and her mother. Based upon the interviews, the detective arrested Harris.

### III. Sufficient Evidence

{¶ 18} We address Harris's second assignment of error first. In this assignment of error, Harris contends that there is insufficient evidence to support his convictions for gross sexual imposition in Count 7 and, consequently, kidnapping in Count 9.

{¶ 19} When assessing a challenge of sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶ 20} In Count 7, Harris was charged with gross sexual imposition in violation of R.C. 2907.05(A)(4), which provides that

> [n]o person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when * * * [t]he other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

{¶ 21} "Sexual contact" means "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). Count 7 specifically charges Harris with having sexual contact with the victim by touching her breasts with his mouth.

{¶ 22} Harris claims that the state failed to demonstrate "sexual contact." In support, he argues that the victim only testified that Harris touched her chest, not her breasts, and the nurse testified that the victim did not have fully developed breasts but rather "breast buds starting and some development of breast tissue." Harris contends, therefore, that even if the testimony is believed, the contact to which the victim testified is not the "touching of an erogenous zone."

{¶ 23} For purposes of convicting a defendant of gross sexual imposition in violation of R.C. 2907.05(A), the female breast is "per se [an] erogenous zone * * * and the state is relieved of the obligation to prove that [the breast is], in fact, [an] erogenous zone[]." *State v. Kleyman*, 8th Dist. Cuyahoga No. 90817, 2008-Ohio-6656, ¶ 26, citing *State v. Ackley*, 120 Ohio Misc.2d 60,

2002-Ohio-6002, 778 N.E.2d 676, ¶ 9 (C.P.). And a female's "chest area" or the area "between a female's breasts" is within the erogenous zone contemplated by the statute. *State v. Harrel*, 5th Dist. Delaware No. 99CAA03013, 2000 Ohio App. LEXIS 38, 7 (Jan. 3, 2000); *see also State v. Patel*, 2d Dist. Greene No. 2010-CA-77, 2011-Ohio-6329, ¶ 64 (rejecting the defendant's attempt to distinguish between the victim's "breast" from her "chest" where the victim testified the defendant "kissed her 'chest'" and finding the defendant's act of kissing the victim's "chest" was sufficient to establish the contact necessary for a sexual imposition conviction).

{¶ 24} Moreover, Harris was charged under R.C. 2907.05(A)(4) with the gross sexual imposition of a person less than 13 years of age. This section of the statute expressly addresses conduct perpetrated upon prepubescent and pubescent children and was arguably created to provide enhanced protection to children. It is entirely possible, and perhaps even likely, that a victim of this age — for which the statute was designed to protect — will have not yet developed breasts. In fact, the nurse testified as such, stating that the victim was beginning to develop breast tissue. It is therefore unreasonable to find that a child's undeveloped breast, or her chest, is not an area protected by statute, and we reject Harris's argument that because the victim "did not technically have breasts," he could not have been convicted of touching an erogenous zone.

{¶ 25} In light of the foregoing, we find the state presented evidence of sexual contact, namely that Harris touched the victim's erogenous zone, sufficient

to support a conviction for gross sexual imposition in violation of R.C. 2907.05(A)(4) where the young victim testified that Harris licked her chest.

{¶ 26} Harris's second assignment is overruled.

### IV. Manifest Weight of the Evidence

{¶ 27} In his first assignment of error, Harris contends that the convictions are not supported by the manifest weight of the evidence. In support, he argues that the trial court lost its way because it had "no method to verify the truth of" the victim's statements, no physical evidence corroborated the victim's statements, and the victim's testimony was "riddled with inconsistency."

{¶ 28} A manifest weight challenge questions whether the state has met its burden of persuasion. *Thompkins*, 78 Ohio St.3d at 390, 678 N.E.2d 541. This challenge raises a factual issue:

> "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). The use of the word "manifest" in the standard of review "means that we can only reverse the trier of fact if its decision is very plainly or obviously contrary to the evidence." *State v. Hernandez*, 8th Dist. Cuyahoga No. 106577, 2018-Ohio-5031, ¶ 20.

{¶ 29} Here, in support of the allegations in Count 7, K.P. testified that Harris licked her chest in the summer of 2017. In her testimony, she provided specific details surrounding the incident, including that Harris pushed her shirt and bra up in order to "lick" her chest, that it "didn't feel right," and that she told Harris to "stop" and "get off." Regarding Count 10, K.P. testified that in June 2018, Harris placed his hands in her pants and began touching the outside of her "private part." K.P. explained that Harris specifically called K.P. back down to the basement after her siblings left and they were therefore alone in the basement when he pulled her over to the couch and began touching her. She also testified that she told him to stop and she attempted to get away from him by running upstairs and hiding in the closet.

{¶ 30} Although, as Harris argues, there is no eyewitness or any testimony supporting K.P.'s allegations, it is well settled that a sexual assault conviction may rest solely on the victim's testimony, if believed, and there is no requirement that a victim's testimony be corroborated. *State v. Castellon*, 8th Dist. Cuyahoga No. 106813, 2019-Ohio-628, ¶ 41; *State v. Magwood*, 8th Dist. Cuyahoga No. 105885, 2018-Ohio-1634, ¶ 32; *State v. Patterson*, 8th Dist. Cuyahoga No. 100086, 2014-Ohio-1621, ¶ 40. Moreover, K.P.'s testimony concerning Harris's conduct in licking her chest and in touching her private parts under her pants was consistent with what she reported to the SANE nurse.

{¶ 31} Harris also contends that there is no physical evidence supporting K.P.'s testimony. A lack of physical evidence, however, "does not require reversal

since a victim's testimony, if believed, is sufficient to obtain and sustain a rape conviction." *State v. Butts*, 8th Dist. Cuyahoga No. 55549, 1989 Ohio App. LEXIS 2856, 4 (July 20, 1989); *State v. Timmons*, 10th Dist. Franklin Nos. 13AP-1038 and 13AP-1039, 2014-Ohio-3520, ¶ 23 (stating that physical or forensic evidence is not required to prove rape).

{¶ 32} Finally, Harris claims that K.P.'s testimony was "riddled with inconsistency." In support, he argues the following: while K.P. learned of stranger danger at school, she did not disclose her allegations until getting into trouble for not cleaning the basement; K.P. reported to the nurse that Harris had touched her buttocks but she told the police that he did not; K.P. testified that Harris choked her in the basement, but Mother's testimony did not support K.P.'s account of the incident; and K.P. testified that Harris made her watch porn but that she "actually * * * didn't watch it, she looked away from the porn."

{¶ 33} A conviction is not against the manifest weight of the evidence "solely because the [factfinder] heard inconsistent or contradictory testimony." S*tate v. Rudd*, 8th Dist. Cuyahoga No. 102754, 2016-Ohio-106, ¶ 72, citing *State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38, citing *State v. Asberry*, 10th Dist. Franklin No. 04AP-1113, 2005-Ohio-4547, ¶ 11; *see also State v. Mann*, 10th Dist. Franklin No. 10AP-1131, 2011-Ohio-5286, ¶ 37 ("'While the jury may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.'"), quoting *State v. Nivens*, 10th

Dist. Franklin No. 95APA09-1236, 1996 Ohio App. LEXIS 2245, 7 (May 28, 1996). The factfinder "'may take into consideration a witness's conflicting testimony in determining her credibility and the persuasiveness of her account by either discounting or resolving the discrepancies.'" *State v. Taylor*, 10th Dist. Franklin No. 14AP-254, 2015-Ohio-2490, ¶ 34, quoting *State v. Rankin*, 10th Dist. Franklin No. 10AP-1118, 2011-Ohio-5131, ¶ 29.

{¶ 34} In this case, we do not find the factfinder lost his way in resolving the alleged "inconsistencies" noted above. Nor do we find these alleged inconsistencies rendered Harris's conviction against the manifest weight of the evidence. K.P. testified that she was afraid of Harris because he was muscular and had tattoos; she testified that she tried to tell the detective everything she remembered; and the fact that K.P. looked away from the porn Harris showed K.P. does not create an inconsistency in her testimony that Harris made her watch porn. Moreover, although Mother did not testify that she too saw Harris choke K.P., Mother testified that her head was turned before she saw Harris grab K.P. by the shirt and they began to "tussle." Mother also testified that K.P. was crying and upset, which was unusual for K.P., and Mother told Harris to "let her go." Mother's testimony does not contradict K.P.'s testimony in this regard.

{¶ 35} Having reviewed the evidence, we cannot say the factfinder lost his way in resolving any conflicts in the evidence and created a manifest miscarriage of justice such that Harris's conviction in Counts 7, 9, 10, and 11 must be reversed and a new trial ordered.

{¶ 36} Harris's first assignment of error is overruled.

{¶ 37} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MICHELLE J. SHEEHAN, JUDGE

EILEEN A. GALLAGHER, P.J., and
MARY EILEEN KILBANE, J., CONCUR